## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IBALDO ARENCIBIA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Case No.** 4:20-cv-00819-O |
| | § | |
| AGA SERVICE COMPANY, *et al*, | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR CLASS CERTIFICATION

---

<u>**TABLE OF CONTENTS**</u>

**I.   INTRODUCTION** ................................................................................................1

**II.   FACTUAL BACKGROUND** ...............................................................................3

**III.   PROCEDURAL BACKGROUND**......................................................................8

**IV.   REQUIREMENTS OF LOCAL RULE 23.2** ....................................................8

    A.   THE SUIT IS PROPERLY MAINTAINABLE AS A CLASS ACTION UNDER FED. R. CIV. P. 23.........8

    B.   SPECIFIC FACTUAL ALLEGATIONS CONCERNING THE ALLEGED CLASS. ...............................8

       1.   Approximate number of class members. ......................................................................8

       2.   Definition of the class and any subclasses.................................................................9

       3.   Distinguishing and common characteristics of class members. .....................................9

       4.   Questions of law and fact that are common to the class.................................................10

       5.   Findings required by Fed. R. Civ. P. 23(b)(3). ............................................................11

    C.   BASIS OF THE NAMED PLAINTIFF'S CLAIM TO BE AN ADEQUATE REPRESENTATIVE OF THE
CLASS. ...................................................................................................................11

    D.   BASIS FOR DETERMINING ANY REQUIRED JURISDICTIONAL AMOUNT. ................................11

    E.   TYPE AND ESTIMATED EXPENSE OF NOTICE TO BE GIVEN TO CLASS MEMBERS. ...................12

    F.   DISCOVERY NECESSARY FOR A CLASS CERTIFICATION HEARING. .......................................12

    G.   ARRANGEMENTS FOR PAYMENT OF PLAINTIFF'S ATTORNEY'S FEES..................................12

**V.   ARGUMENT** ....................................................................................................13

    A.   THIS ACTION SATISFIES THE REQUIREMENTS OF FED. R. CIV. P. 23(A). .............................13

       1.   The class is so numerous that joinder of all members is impracticable........................13

       2.   There are questions of law or fact common to the class. ...............................................13

       3.   Plaintiff's claims are typical of the claims of the class...................................................14

       4.   Plaintiff will fairly and adequately protect the interests of the class. ...........................16

    B.   THIS CLASS ACTION MAY BE MAINTAINED UNDER FED. R. CIV. P. 23(B)(2).......................17

    C.   THIS CLASS ACTION MAY BE MAINTAINED UNDER FED. R. CIV. P. 23(B)(3).......................18

       1.   Common questions of law or fact predominate over any individual questions. ...........18

       2.   A class action is superior to other methods for adjudicating the controversy...............24

**CONCLUSION** ........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<span style="text-align:center">C<small>ASES</small></span>

*Amoco Prod. Co. v. Smith*,
946 S.W.2d 162 (Tex. App. 1997) ---------------------------------------------------------------- 19

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
242 F.3d 290 (5th Cir. 2001) -------------------------------------------------------------- 14, 18, 19

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ---------------------------------------------------------------- 13

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) -------------------------------------------------------------------------- 22

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ------------------------------------------------------------- 20

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ---------------------------------------------------------------- 24

*City of Miami v. Bank of Am. Corp.*,
800 F.3d 1262 (11th Cir. 2015) ----------------------------------------------------------- 20

*Davis v. Powertel, Inc.*,
776 So. 2d 971 (Fla. App. 2000) ----------------------------------------------------------- 20

*Durrett v. John Deere Co.*,
150 F.R.D. 555 (N.D. Tex. 1993) ---------------------------------------------------------- 23

*Edwards v. Mid-Continent Office Distributors, L.P.*,
252 S.W.3d 833 (Tex. App. 2008) -------------------------------------------------------- 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) -------------------------------------------------------------------------- 19

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ---------------------------------------------------------------- 15

*Flecha v. Medicredit, Inc.*,
946 F.3d 762 (5th Cir. 2020) ---------------------------------------------------------------- 15

*Heldenfels Bros. v. City of Corpus Christi*,
832 S.W.2d 39 (Tex. 1992) ------------------------------------------------------------------ 19

*Horton v. Goose Creek Indep. Sch. Dist.*,
690 F.2d 470 (5th Cir. 1982) ------------------------------------------------------------- 16

*Houle v. Casillas*,
594 S.W.3d 524 (Tex. App. 2019) ------------------------------------------------------- 19

*Ibe v. Jones*,
836 F.3d 516 (5th Cir. 2016) ------------------------------------------------------------- 18

*In re Corrugated Container Antitrust Litig.*,
643 F.2d 195 (5th Cir. 1981) ------------------------------------------------------------- 16

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ------------------------------------------------------- 14, 18, 19

*In re TWL Corp.*,
712 F.3d 886 (5th Cir. 2013) ------------------------------------------------------------- 24

*James v. City of Dallas, Tex.*,
254 F.3d 551 (5th Cir. 2001) ------------------------------------------------------------- 15

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) --------------------------------------------------------- 23

*M.D. v. Perry*,
294 F.R.D. 7 (S.D. Tex. 2013) ----------------------------------------------------------- 17

*Miller v. Mackey Int'l, Inc.*,
452 F.2d 424 (5th Cir. 1971) ------------------------------------------------------------- 13

*Morgan v. United Parcel Serv. of Am., Inc.*,
169 F.R.D. 349 (E.D. Mo. 1996)--------------------------------------------------------- 16

*Morrow v. Washington*,
277 F.R.D. 172 (E.D. Tex. 2011) ------------------------------------------------------- 18

*Mullen v. Treasure Chest Casino, LLC*,
186 F.3d 620 (5th Cir. 1999) ------------------------------------------------------------- 13

*Neff v. VIA Metro. Transit Auth.*,
179 F.R.D. 185 (W.D. Tex. 1998) ------------------------------------------------------- 14

*Nelson v. Mead Johnson Nutrition Co.*,
270 F.R.D. 689 (S.D. Fla. 2010) --------------------------------------------------------- 21

*Robinson v. Texas Auto. Dealers Ass'n*,
387 F.3d 416 (5th Cir. 2004) -------------------------------------------------------------- 24

*Slade v. Progressive Sec. Ins. Co.*,
856 F.3d 408 (5th Cir. 2017) -------------------------------------------------------------- 16

*Trugreen Landcare, L.L.C. v. Scott*,
512 F. Supp. 2d 613 (N.D. Tex. 2007) --------------------------------------------------- 22

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) -------------------------------------------------------------- 24

*Ward v. Hellerstedt*,
753 F. App'x 236 (5th Cir. 2018) --------------------------------------------------------- 16

*Waste Pro USA v. Vision Constr. ENT, Inc.*,
282 So. 3d 911 (Fla. App. 2019) ---------------------------------------------------------- 20

*Zeidman v. J. Ray McDermott & Co.*,
651 F.2d 1030 (5th Cir. 1981) ------------------------------------------------------------ 13

### STATUTES

Tex. Bus. & Com. Code §17.46 ----------------------------------------------------------- 23

Tex. Bus. & Com. Code §17.50 ----------------------------------------------------------- 23

### RULES

Fed. R. Civ. P. 23 ------------------------------------------------------------------passim

## I.      INTRODUCTION

Businesses need consumers and consumers need businesses. It is a partnership at the core of our way of living. This partnership is even more important in industries like aviation, where an airline can capture 60% or more of a given market and consumers have less options. This should-be-harmonious relationship is unfairly disturbed when businesses cheat consumers systematically, and consumers have no real, viable remedy. This case asks this Court to provide one.

The context is a "trip insurance" that AGA Service Company d/b/a Allianz Global Assistance ("Allianz") sells in American Airlines, Inc.'s ("AA") website.[1] The core of Plaintiff's claims is that Defendants know they are selling a very narrow policy, covering things that rarely occur (like medical emergencies or catastrophic events) and that, despite knowing this, they grossly misrepresent the contents of the trip insurance policies in an effort to give consumers the net impression that they are selling a very broad, no-fault travel protection product. It is no surprise that when consumers realize what it is they purchased, they feel that Allianz is "the scam of all scams," "a total rip-off," a "crooked company," a "thief," or that the "feds should look into this sham."[2]

Defendants misrepresent their trip insurance in at least five ways, as seen in Image 1 below.

**Image 1**



---

[1] Jefferson Insurance Company ("Jefferson") acts as the "underwriter" of the "trip insurance."
[2] During this brief "App." refers to the Appendix in Support of Plaintiff's Motion for Class Certification.

First, by mislabeling it "Trip Insurance." By plainly calling their medical emergency insurance "trip insurance," rather than including the words "medical emergency" or "catastrophe" in the context of purchasing flight tickets, consumers get an initial impression that the product is broad, and that it insures the price paid for the trip. The flights, in other words.

Second, by stating that the insurance includes "trip cancellation" without modifiers. A reasonable consumer understands "trip cancellation" to mean a cancellation of the trip, other than an airline cancellation. In other words, consumers understand "trip cancellation" means exactly that—trip cancellation. When Defendants also state that the offer, besides trip cancellation, includes trip interruption, baggage delay, *and more*, consumers reasonably believe the offer to be more expansive and include, at a minimum, trip cancellation.

Third, by representing to consumers that if they decline coverage, they are "responsible for all cancellation fees and expenses." A reasonable consumer would get the net impression that if he does not decline to purchase the trip insurance, he is then *not* responsible for "all cancellation fees and expenses."

Fourth, by advising consumers to "Prepare for the unexpected" and that "It's wise to always consider a travel protection plan to cover your trip costs from the unexpected." By using the word "unexpected" twice, without qualifiers, a reasonable consumer gets the impression that *any* unexpected or unforeseen event is covered, like for instance, a work-related emergency. As put by one consumer: "what is the point of buying insurance if it is not going to help us when unforeseen circumstances occur."[3] "What is the point of buying cancellation insurance when they don't cover you for cancellation" writes another upset consumer.[4]

---

[3] App.171.
[4] App.8.

Fifth, by not making a single mention in the offer of the core, and virtually only things covered by their product: medical emergencies and catastrophic events. The contrast between the broadness of the offer and the actual narrow nature of the product greatly misleads consumers into buying something they did not want.

In short, the name of the product, the sweeping and broad representations of coverage, the harsh effects of declining (i.e., paying "all fees"), the appeals to fear of the "unexpected," and the failure to include any hint as to what the product really is (i.e., for medical emergencies), all create the promise of a sweet package of coverage at a convenient price and at the right moment that is, in essence and substance, different from what the product contains. This is what this case is about.

## II.   FACTUAL BACKGROUND

*The offer, the purchase, and the claim.*

On August 17, 2019, Ibaldo Arencibia ("Arencibia") bought a roundtrip ticket to Bogotá, Colombia to attend an expo from October 23-25. Unsure of whether he was going to have gigs at the time of the expo, Arencibia was looking for options to be able to cancel his trip so he did not miss any job opportunities. While purchasing his ticket, Arencibia saw just that in Allianz's offer of insurance.[5] When Arencibia saw the offer of insurance he got the impression that the product was broad and provided cancellation protection for *any* unexpected event. Arencibia, based on the offer, believed that, if he selected the insurance option, he would not be responsible for cancellation fees and expenses in the event a gig came up and he needed to cancel. Thus, he clicked on it.

As it turned out, Arencibia was offered to go on tour as a technician to several states in the U.S. on days that overlapped with the already-purchased Bogotá trip. Thinking he was "insured,"

---

[5] On information and belief, Arencibia saw an offer of insurance equal or substantially similar to the one found in Image 1.

Arencibia called Allianz. During the call, Arencibia was told by an Allianz agent that his work conflict was not covered by his policy. Arencibia was also told that he should call AA to cancel the trip and then submit a claim online to "see what could be done." Compl., ¶ 21.[6]

On September 2, 2019, as instructed by the Allianz agent, Arencibia cancelled the flight with AA and completed the online claim submission. Arencibia then received an email saying that he needed to wait ten business days for Allianz to review the claim. *Id*. at ¶ 22; App.611. On September 9, 2019, Arencibia received a letter from Allianz stating:

> We have completed our review of your claim, and unfortunately are unable to pro-vide benefits under the coverage you purchased because:
>
> As your insuring agreement indicated, this is a named perils travel insurance pro-gram, which means it covers only the specific situations, events and losses included in this document, and only under the conditions we describe. Unfortunately, trip cancellation due to being required to work is not included among those reasons.

*Id.* at ¶ 23; App.613.

*The truth about the "trip protection" product.*

The real contents of the trip insurance policy are laid out in the "Individual Travel Insurance Policy." App.572-607. In it, Allianz describes the "covered" reasons for cancellation. Items 1 through 7 are related to illness, injury, a medical condition, or death. Items 9 through 16 relate to catastrophic events in connection with weather, terrorism, and other similar events. App.586-87. Nowhere in the offer does Allianz tell consumers: "this is a medical emergency, illness, or cata-strophic event insurance." Nowhere in the offer does Allianz disclose, for example, what it writes in its letter denying insurance to Arencibia: "this is a named perils travel insurance program, which means it covers only the specific situations, events and losses included in this document." App.613. Nor does Allianz disclose what it writes in its "About this Policy" document: "Not every loss is

---

[6] "Compl." refers to the Amended Class Action Complaint [ECF 84].

covered, even if it is due to something sudden, unexpected, or out of *your* control. Only those losses meeting the conditions described in this *policy* may be covered." App.577. (emphasis in original).

Allianz's post-purchase emails are equally misleading. For example, Allianz emails its customers saying, "Thanks for protecting your upcoming travel plans with us." App.608-10. The entire "thank you" email lacks any disclosure of the substance, essence, and nature of Allianz's coverage: medical emergencies and catastrophic events.

To make matters worse, Allianz's "insurance policy" is provided to consumers only under two circumstances: First, *after* payment is made (simultaneously with the flight ticket payment), through a separate link that then leads the purchaser to a 32-page sophisticated legal document that is, in nature and substance, different from the offer conveyed to consumers pre-payment. App.572. Second, by clicking on the "See coverage details" hyperlink, which takes consumers to a website with *some* details about the policy and further links. App.614. One of these links, "Plan Details," takes consumers to another website where they must select the state where they live, and click on yet another link, "Plan and Pricing Details." App.618. After clicking on three different links and being three screens away from the original offer of insurance, consumers get to a document detailing the terms of the individual travel insurance policy through a process that is cumbersome by design.[7]

---

[7] For convenience, we placed the four-tier process more graphically below:

"Terms, conditions and exclusions apply. See coverage details." [**click one**]

↳ "Plain Details" [**click two**] (four different links to click on page 2 of a 4-page document with 10 drop down options).

  ↳ Select state website [scroll + **click three** on state]; "Plan Details" and "Pricing Details" [**click four**, on either link].

    ↳ 32-page document.

Disclosure, however, is not difficult. Other companies easily disclose the contents of what they are selling to consumers. For example, Travelgenio offers two trip protection products: Basic Cancellation Protection and Cancellation Protection Plus. Travelgenio's Basic Cancellation Protection is akin to Allianz's trip insurance in that the core of the coverage is for medical reasons. The difference is that Travelgenio discloses this up front. Right below the "Choose" button, Travelgenio tells consumers: "Get your ticket price* refunded if you are unable to travel for *medical reasons*." *See* Image 2.

**Image 2**



Travelgenio's customers will understand that by paying $16.50 they are protected in case of a *medical event* that prevents travel. Similarly, consumers will be able to make an informed decision as to the Cancellation Protection Plus offer. They will know that if they pay three times the price of the Basic Cancellation Protection, they will be able to protect their trip *no matter the cause*. This plain, natural language disclosure of trip protection products is in stark contrast with Allianz's and AA's. In reality, Defendants offer a Basic Cancellation Protection (or less) dressed as a Cancellation Protection Plus. Consumers are purchasing, by the thousands, Defendants' product thinking that it is a Cancellation Protection Plus type, only to find out the truth at the moment

of trying to make use of the product. When consumers discover that they really bought nothing, they are understandably upset and describe Allianz and its product as a "big hot steaming pile."[8]

To add insult to injury, Allianz has an intentionally cumbersome claims process for all claims, even for the few claims potentially covered under its narrow policy.[9] As one consumer put it, "I have spent endless hours being transferred to agents and completing paperwork. I have spent money on getting these letters [requested by Allianz] sent with confirmed signature. And now I am left having to cover thousands of dollars for a medical bill that was supposed to be covered."[10] Another consumer described it: "Can't get a hold of anyone . . . 3 months later another request for a doctor's proof."[11]

The impression consumers obtain of Allianz's product is not of a company that provides "trip protection," but rather of a company that defrauds consumers. This is not based on a random selection of consumers. Approximately 46% of Yelp.com reviews contain some version of the word scam, fraud, rip-off, sham, or crook.[12] 20% of the same reviews describe a pattern of tactical delay in the claims process by Allianz.[13] Similarly, 19% of reviews in Google Maps contain some version of the word scam, fraud, rip-off, sham, or crook,[14] while 20% of consumers describe a pattern of tactical delay during the claim process.[15] Overall, Allianz holds a 1.5/5 star rating in

---

[8] App.170.
[9] Undersigned counsel for Arencibia created a summary of the feedback obtained online about the trip insurance. Highlighted in blue in the summary (App.2-5 and 123-141) are consumers repeated concerns about the difficult claims process.
[10] App.153.
[11] App.156.
[12] *See generally* App.2-5. Reviews are available also at https://www.google.com/maps/ (last visited 11/02/2020).
[13] *Id.*
[14] *See generally* App.123-141. Reviews are available also at https://www.yelp.com/biz/allianz. (last visited 11/02/2020).
[15] *Id.*

Yelp, and a 2.1 rating in Google Maps.[16] The net impression, is clear.

## III.  PROCEDURAL BACKGROUND

On October 17, 2019, Arencibia filed a Class Action Complaint in the Southern District of Florida. On December 13, 2019, Defendants filed motions to dismiss the Complaint [ECF 26, 29]. On December 27, 2019, AA filed a Motion to Sever and Transfer Allegations against American Airlines [ECF 33]. A hearing on these motions was held on August 5, 2020. At the hearing, the Honorable Judge Marcia G. Cooke ordered that the case be transferred to this Court in its entirety. Judge Cooke made no ruling on the pending motions to dismiss. On October 16, 2020, Plaintiff filed a motion for leave to file an Amended Class Action Complaint [ECF 82]. The Court granted the motion and docketed the Amended Complaint as of October 16, 2020 [ECF 84].

In his Amended Complaint, Arencibia brings claims for declaratory relief, unjust enrichment, violations of the Florida Deceptive and Unfair Trade Practices Act, of the Racketeer Influenced and Corrupt Organizations Act, and of the Texas Deceptive Trade Practices Act.

## IV.  REQUIREMENTS OF LOCAL RULE 23.2

### a.  The suit is properly maintainable as a class action under Fed. R. Civ. P. 23.

This suit is appropriate for class certification pursuant to Fed. R. Civ. P. 23(b)(2) and (3). Plaintiff addresses the applicability of these sections in more detail in Section V of this brief, *infra*.

### b.  Specific factual allegations concerning the alleged class.

#### 1.  Approximate number of class members.

The precise number of class members is currently unknown, but it is determinable from data in Defendants' possession. Preliminary research reflects that the number of class members will be in the tens of thousands or more. For example, AA flew 155,785,000 passengers in 2019

---

[16] App.6; 143.

in the U.S. alone.[17] If only 1% of these passengers purchased trip insurance, the class could potentially consist of 1,557,850 members. In this regard, Defendants will be able to determine how many consumers purchased trip insurance on AA's website during the relevant timeframe. Plaintiff will conduct discovery on numerosity and has already served document discovery requests on Defendants. This element is discussed in more detail in Section V.a.1., *infra*.

### 2.    Definition of the class and any subclasses.

The Class and Subclasses in this action are defined as:

**Nationwide Class**

> All persons who purchased a trip insurance policy from Allianz through AA's website within the applicable limitations period (the "Class Period").

**Florida Subclass**

> All Florida residents who purchased a trip insurance policy from Allianz through AA's website within the applicable limitations period.

**Texas Subclass**

> All Texas residents who purchased a trip insurance policy from Allianz through AA's website within the applicable limitations period.

### 3.    Distinguishing and common characteristics of class members.

The common characteristics of the class members include that they (1) were all in the process of purchasing a flight ticket with AA; (2) were presented with the same or substantially the same misleading offer of insurance; and (3) had the impression that Allianz's product was a broad, no fault trip protection policy for the flights.

The primary distinction among class members is that they reside in different parts of the

---

[17] https://www.bts.gov/newsroom/2019-traffic-data (last visited 11/02/2020).

9

United States.[18] Additionally, the class members' damages may vary in sum because of the different amounts paid for their respective flights. However, given that the price of the trip insurance is a percentage of the flight price, the amount of damages will be ascertainable from records in the possession of Defendants. This element is discussed in more detail in Section V.a.2., *infra*.

### 4. Questions of law and fact that are common to the class.

The common questions of fact and law include:

(a)     Whether Defendants intentionally or negligently misrepresent the nature of the trip cancellation policy at the time it is offered to consumers, in order to induce consumers to buy an extremely narrow policy that, had Defendants truthfully disclosed, consumers would not otherwise buy;

(b)     Whether consumers get the net impression that Allianz's offer of insurance provides a broad no-fault coverage;

(c)     Whether consumers get the net impression that Allianz's offer of insurance is related only to medical emergencies or catastrophic events;

(d)     Whether consumers get the net impression that Allianz's offer of insurance is deceptive;

(e)     Whether AA's actions set the stage for Allianz's unlawful practices (and colludes with Allianz and Jefferson) by (1) conveniently placing a knowingly misleading offer of insurance in the payment section of its powerful site; (2) having a burdensome cancellation and change of flights process; and (3) confusing consumers as to who is the true sponsor of the travel protection insurance in a way that leaves consumers who are uncertain about travel dates at the time of purchase with the empty "travel insurance" as the only available travel protection alternative; and

(f)     Whether AA should be permitted to let Allianz and Jefferson use its large platform to place a grossly misleading offer, even if AA is not directly the provider of the insurance protection policy.

This element is discussed in more detail in Section V.a.2-3., *infra*.

---

[18] In the Summary of Consumers' Impressions in Yelp.com (App.123-141) we can see that consumers from all over the United States purchased trip insurance from Allianz.

### 5.    Findings required by Fed. R. Civ. P. 23(b)(3).

This case satisfies the predominance requirement of Fed. R. Civ. P. 23(b)(3) because a common course of conduct has been alleged arising out of a simple, common nucleus of operative facts—Allianz's offer of insurance. All claims in this matter arise from the offer, which is the same or substantially the same in all cases. This case also satisfies the superiority requirement of Fed. R. Civ. P. 23(b)(3) because it is more efficient to litigate thousands of claims like Arencibia's in one single action. In fact, individual litigation of each individual claim, in many cases amounting to just a few dollars, would not be viable other than through a class action. The case is also manageable because there is no conflict of laws; either Texas, Florida, or Federal law will apply to the claims. Finally, Class Members are identifiable as Defendants obtain their information at the time of purchase. These factors are discussed in more detail in Section V.a.2-3., *infra*.

### c.    Basis of the named plaintiff's claim to be an adequate representative of the class.

Plaintiff is a competent representative of the Class. He understands the issues in this litigation well and his responsibility as a class representative. There are no conflicts of interest between Plaintiff and the Class. The financial responsibility to fund this action has been assumed by counsel for Plaintiff based on a contingency fee agreement.

### d.    Basis for determining any required jurisdictional amount.

In the United States alone, AA enplaned 155,785,000 passengers in 2019.[19] The average domestic flight fare in 2019 was $336.13.[20] Presumably, AA presented Allianz's offer of insurance to all 155,785,000 passengers. If, hypothetically, 5% of all U.S. passengers purchased trip

---

[19] https://www.bts.gov/newsroom/2019-traffic-data-us-airlines-and-foreign-airlines-us-flights-final-full-year (last visited 10.08.2020).
[20] https://www.transtats.bts.gov/AverageFare/ (last visited 10.08.2020).

protection, that represents a total of 7,789,250 passengers. If all these passengers paid, like Aren-cibia, 7.5% of their flight price for the misleading offer of insurance (an average of $25.21), then damages would be around $196,365,045. If only 1% of all U.S. passengers purchased trip protec-tion, it would represent a total of 1,557,850 passengers. At an average price of $25.21 per person, damages would still be $39,273,009 in one year, well above the jurisdictional amount required by 28 U.S.C. §1332(d)(2)(A). This calculation does not account for AA's international sales or for all years alleged in the action under the applicable statute of limitations.

     **e.**     **Type and estimated expense of notice to be given to class members.**

Notice can be achieved via a designated website where class members may submit their claims. Additionally, since Defendants require all purchasers of trip insurance to provide an email address, notice can also be made by emailing class members. Given that notice will be achieved electronically, there will not be high costs associated with it. Although Defendants should bear the costs of notice, Plaintiff's counsel will assume these costs if ordered to do so by this Court.

     **f.**     **Discovery necessary for a class certification hearing.**

In connection with seeking class certification, Plaintiff has served discovery on Defendants. In addition to these discovery requests, Plaintiff intends to depose the following individuals: (1) the AA representative in charge of the relationship with Allianz in connection with the sale of trip insurance; (2) the Allianz representative in charge of customers' complaints regarding trip insur-ance; (3) an Allianz representative with knowledge of the trip insurance claims process. The time estimated to complete Class certification discovery is 90-days.

     **g.**     **Arrangements for payment of plaintiff's attorney's fees.**

Attorney's fees and expenses of class counsel are to be paid out of any recovery in the case. Until then, Plaintiff's counsel will finance the case on behalf of the putative class.

## V.     ARGUMENT

As a preliminary matter, is important to note that "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971). This is especially true where, as here, the motion for class certification is filed at the pleading stage of the case. *See Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975) (affirming a conditional certification decision and stating that "[a] court is bound to take the substantive allegations of the complaint as true").

### a.     This action satisfies the requirements of Fed. R. Civ. P. 23(a).

#### 1.     The class is so numerous that joinder of all members is impracticable.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable; this is the "numerosity" requirement. Fed. R. Civ. P. 23(a)(1). To establish numerosity "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). Classes ranging between 100 to 150 members have been held to satisfy numerosity. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624-25 (5th Cir. 1999). In this case, a reasonable estimate based on records from the U.S. Department of Transportation reveals that AA may have offered Allianz's trip insurance to up to 155,785,000 passengers in 2019 alone. Thus, it is reasonable to infer that more than 100 people (or 0.0000006% of the total passengers in 2019) may have purchased trip insurance based on the deceptive offer.

#### 2.     There are questions of law or fact common to the class.

Rule 23(a)(2) requires that there be questions of law or fact common to the class; this is the "commonality" requirement. Fed. R. Civ. P. 23(a)(2). "Even a single common question" will

satisfy commonality. *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014). Where declaratory or injunctive relief common to all class members is sought, the commonality test is readily satisfied. *See Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 193 (W.D. Tex. 1998) (finding that "class actions seeking injunctive or declaratory relief often by their very nature present common questions fulfilling [the] commonality requirement"). Furthermore, when a defendant has engaged in a single or uniform act or course of conduct giving rise to a cause of action, at least one or more elements of the cause of action will be common. *See Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 297 (5th Cir. 2001).

In this case, Plaintiff's complaint arises out of the exact same (or virtually the same) offer of insurance. All members of the class saw the same offer of insurance and thereafter obtained the impression that it was a broad, no-fault coverage type of protection. Based on this incorrect impression, they proceeded to purchase the insurance. A jury in this case will not be presented with thousands of different versions of an offer but with one or two. All class members clicked on the purchase based on the prominently displayed offer. In a single trial, the jury will be able to decide if the offer is misleading or not. If the jury decides that the offer is misleading, Defendants may have violated the law and injured all class members. Similarly, the jury will be presented with evidence of the sale scheme in which AA is a key part. The set-up of the sale is always the same, it occurs in the same website, follows the same steps, and is presented at the same time in the payment process, in uniform fashion to *all* class members. If the jury determines based on this that AA is an active participant in a grossly deceiving offer of insurance, AA could be liable to all those it exposed to the deceiving offer.

### 3.    Plaintiff's claims are typical of the claims of the class.

Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims

14

of the class; this is the "typicality" requirement. Fed. R. Civ. P. 23(a)(3). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020). "Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001).

> Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.

*Id*. Moreover, the presence of an arguable unique defense does not necessarily destroy typicality. *See Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005).

Here, the claims of Arencibia are similar to the claims of those he intends to represent. Like Arencibia, a reasonable consumer would have had the impression that the insurance product was broad and not limited to medical emergencies or catastrophic events. Since the offer is always the same, the net impression of consumers will be uniform nationwide. In fact, what consumers say online about the product reflects the mismatch between what they were offered, and what they received. As one consumer put it: "Maybe I am crazy, but I thought people purchased travel insurance for a sense of security, so that if something goes wrong and the circumstances are stressful and/or traumatic, the insurance company will be there to help them . . ." App.66.

While there may be differences, e.g., as to each consumer's particular reason for seeking protection (family related, work related, etc.), the focus of Plaintiff's claims is not on those differences but on the impression formed about the product; on the impression that consumers were protected from an unforeseen event but in reality were not. Moreover, even if there were some varying impressions as to the trip protection offer, it is well settled that complete identity of claims is not required and that "factual differences will not defeat typicality." *James*, 254 F.3d at 571.

15

#### 4. Plaintiff will fairly and adequately protect the interests of the class.

Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class; this is the "adequacy" requirement. Fed. R. Civ. P. 23(a)(4). "The Rule 23(a) requirements of typicality and adequacy of representation are closely related in that demanding typicality on the part of the representative helps ensure his adequacy as a representative." *Ward v. Hellerstedt*, 753 F. App'x 236, 246 (5th Cir. 2018) (internal citations omitted).

In the Fifth Circuit,

> [a]dequacy encompasses three separate but related inquiries (1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent.

*Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (internal citations omitted). "[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981). "In the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to vigorously prosecute the class action." *Morgan v. United Parcel Serv. of Am., Inc.*, 169 F.R.D. 349, 357 (E.D. Mo. 1996).

Here, Arencibia will be an adequate representative of the class. It is clear that Arencibia and all those exposed to Allianz's offer of insurance are asserting a common right, namely, achieving the maximum possible recovery for the damages caused by a misleading offer that induced them to purchase a product they would not have purchased otherwise. There is nothing on the record to indicate any antagonistic interests between Arencibia and the rest of the class. Furthermore, Arencibia is willing to take an active role in representing the class and is committed to

16

protect the interests of absent class members.

Counsel for Arencibia and the class will zealously and competently represent the class. It is difficult to imagine, considering the economics of class litigation, that undersigned counsel for Arencibia would have undertaken a lawsuit of this magnitude, against formidable opponents, in a foreign jurisdiction, if they lacked zeal. Furthermore, counsel for Arencibia has conducted an extensive investigation of the class claims, including review of documents and pre-suit work. During this case, counsel for Arencibia have already committed significant manpower in representing the class and are fully committed to continuing to do so in the future. Additionally, counsel for Arencibia are experienced in complex litigation, trials, appeals and the type of claims asserted in this action. For these reasons, Plaintiff requests that this Honorable Court appoint the undersigned attorneys as class counsel, with Eduardo Ayala Maura, Esq. as lead counsel.

### b. This class action may be maintained under Fed. R. Civ. P. 23(b)(2).

Rule 23(b)(2) permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

To maintain a class action under Rule 23(b)(2), "class members must have been harmed in essentially the same way." *M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013). "Given the threshold requirement of commonality, if a plaintiff has satisfied the requirements of Rule 23(a), then the conditions of Rule 23(b)(2) will tend to follow." *Id.* Here, Plaintiff and all class members were wrongfully induced by Defendants to purchase their travel insurance policies by misrepresenting the substance, essence, and nature of what their product was.

When a plaintiff alleges that a defendant is engaged in a "pattern or practice" of behavior, the pattern or practice must "consist of a uniform policy allegedly applied against the plaintiffs."

17

*Morrow v. Washington*, 277 F.R.D. 172, 196 (E.D. Tex. 2011). There is no question that Defendants engaged in a uniform pattern or practice of grossly misrepresenting the contents of the insurance policies at the time of the offer in an effort to induce consumers who, had they known the truth, would have not purchased them. Because Defendants have acted on grounds that apply generally to the class, final injunctive or declaratory relief is appropriate in this case to stop Defendants from making misleading offers of insurance to present and future consumers.

     **c.**     **This class action may be maintained under Fed. R. Civ. P. 23(b)(3).**

Rule 23(b)(3) permits class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

     **1.**     **Common questions of law or fact predominate over any individual questions.**

In order to predominate, "common issues must constitute a significant part of the individual cases." *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016). To determine whether questions common to the class predominate, the Court must "inquire how the case will be tried." *Id.* The predominance inquiry can be "satisfied under Rule 23(b)(3) if the proceedings are structured to establish liability on a class-wide basis." *In re Deepwater Horizon*, 739 F.3d at 817 (internal citation omitted). Common issues predominate when liability can be determined on a class-wide basis, even if there are some individualized damages. *See Bertulli*, 242 F.3d at 298.

At the heart of this case is what impressions consumers obtained from Defendants' offer of trip protection. "The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014) (citing *Nat'l Bakers Servs., Inc. v. F.T.C.*, 329 F.2d 365, 367 (7th

Cir. 1964)). "Fine print or ineffective disclaimers do not change the message conveyed if the over-all net impression is different." *Id*. Net impression by definition implies the impression of many, making class proof the better way to prove such impressions and what will predominate at trial. And though varying damages among class members is a factor in the predominance inquiry, pre-dominance is still satisfied when "virtually every issue prior to damages is a common issue." *In re Deepwater Horizon*, 739 F.3d at 816.

In cases where injunctive relief is also requested, individualized determinations are not required as to that portion of the relief, which in turn supports a finding of predominance when liability is otherwise common. *See Bertulli*, 242 F.3d at 298.

Now, "[c]onsidering whether questions of law or fact common to class members predomi-nate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). In this case, the underlying claims lend to generalized, class-wide inquiries, not individualized ones.

*Unjust Enrichment/Money Had and Received*

Under Texas law, "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Unjust enrichment occurs when a person has "wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Houle v. Casillas*, 594 S.W.3d 524, 554 (Tex. App. 2019). A claim for unjust enrichment is sometimes referred to as "money had and received." *See Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App. 1997) ("A cause of action for money had and received belongs conceptually to the doctrine of unjust enrichment."). A claim for money had and received "seeks to restore money where equity and good conscience require restitution . . . and it

19

seeks to prevent unconscionable loss to the payor and unjust enrichment to the payee." *Edwards v. Mid-Continent Office Distributors, L.P.*, 252 S.W.3d 833, 837 (Tex. App. 2008).

Under Florida law, there are three elements of an unjust enrichment claim:

first, the plaintiff has conferred a benefit on the defendant; second, the defendant voluntarily accepted and retained that benefit; and, finally, the circumstances are such that it would be inequitable for the defendants to retain the benefit without paying for it.

*City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1287 (11th Cir. 2015).

Each element of the unjust enrichment/money-had-and-received claims is subject to class-wide proof. The benefit is the same: the class members' payments to Defendants via AA's website—all ascertainable through Defendants' records. That Defendants' retention of the benefit is unconscionable (Texas) or inequitable (Florida) is also subject to generalized proof. If the jury determines that Defendant's offer was grossly misleading and that reasonable consumers obtained the net impression that the product sold was of a no-fault, broad coverage type, the jury could find that it was inequitable and/or unconscionable for Defendants to retain these payments. The sweeping and broad representations of coverage, the harsh effects of declining (i.e., paying "all fees"), the appeals to fear of the "unexpected," the failure to include any hint as to what the product really is (i.e., for medical emergencies), and AA's active role in the process, create the set of circumstances that a jury could find to be inequitable and unconscionable.

*Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")*

Plaintiff's claim under FDUTPA has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Waste Pro USA v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 917 (Fla. App. 2019). The Eleventh Circuit has expressly held that the first element "is amenable to class-wide resolution." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986 (11th Cir. 2016); *see also Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. App. 2000) ("The standard of proving

that an act is deceptive and therefore a violation of the statute is the same in a class action as it is in an action initiated by an individual consumer.").

Because Plaintiff "need not show actual reliance on the representation or omission at issue," "the mental state of each class member is irrelevant." *Carriuolo*, 823 F.3d at 985. Moreover, "because the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amenable to class-wide resolution." *Id.* at 986.[21]

In this case, if the jury finds that Allianz's offer of insurance was deceptive and that consumers had the net impression of a broad, no-fault type of coverage, Defendants would be liable to the entire class. This could be achieved in a single trial as more specifically detailed in Plaintiff's Proposed Trial Plan [ECF 91-1]. Though there may be varying damages among class members, damages will easily be determinable because the price of the trip insurance policy is a fixed percentage of the flight ticket price. Moreover, even if damages were individualized, class members' request for declaratory relief is not and, should the Court declare that Defendants wrongfully induced consumers into purchasing travel insurance in violation of FDUTPA, the injunctive damages will be the same for all class members.

*Racketeer Influenced and Corrupt Organizations Act ("RICO")*

"Reduced to their simplest terms, the essential elements of a RICO claim are: (1) a person who engages in (2) a pattern of racketeering activity (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Trugreen Landcare, L.L.C. v. Scott*, 512 F. Supp. 2d

---

[21] *See also Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 (S.D. Fla. 2010) ("[A] deceptive practice can cause a consumer damages even if the consumer does not rely on the deceptive practice when purchasing a particular product. Ostensibly, a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages.").

613, 623 (N.D. Tex. 2007). To prove his RICO claim, Plaintiff will have to establish the existence of an enterprise. Naturally, if Plaintiff can prove that an enterprise exists, it exists for all class members. The predicate acts for Plaintiff's RICO claim include money laundering and fraud by wire and mail. To prove this, Plaintiff will present the scheme described more fully *supra*, in which Defendants partner to feed their deceiving "insurance protection" offer to a protection-starving audience, at the right place (AA's website) and at the right time (check out).[22] This set-up does not vary for Class Members. Millions of consumers are presented with the same offer uniformly.

Furthermore, the Supreme Court has held that a plaintiff need not rely on a defendant's acts of mail or wire fraud to prevail on a RICO claim. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008) ("[N]o showing of reliance is required to establish that a person has violated §1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud."). Therefore, what will predominate at trial is not individual members proving individual factual patterns, but a class of plaintiffs with the same interests, demonstrating a generalized fraudulent scheme.

*Texas Deceptive Trade Practices Act ("DTPA")*

A consumer may maintain an action against any person that uses or employs a false, misleading, or deceptive act or practice that is: "(A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46" and "(B) relied on by a consumer to the consumer's detriment." Tex.

---

[22] Jefferson also plays an important role in the enterprise. Portrayed as the "underwriter," it does no underwriting as that term is understood in the insurance industry. It is a mere front company to give the scheme the appearance of "insurance." For example, in the Individual Travel Insurance Policy signed by Jefferson, Jefferson states that the "policy has been issued based on the information [consumers] provided at the time of purchase." App.577. But consumers provide no information at the time of purchase. Policies are a flat percentage of the flight price, and consumers' circumstances are irrelevant for issuance. Anyone that clicks qualifies. As long as consumers pay for the flights, they will be "insured."

Bus. & Com. Code §17.50(a)(1). Defendants have engaged in several false, misleading, or deceptive acts, which constitute a producing cause of economic damages to Plaintiff and the Class.

When Defendants partner to sell a narrow, medically related trip insurance policy, while portraying it as a broad, no-fault policy, they "advertis[e] goods or services with intent not to sell them as advertised." Tex. Bus. & Com. Code §17.46(9). When Defendants make statements like "Yes, protect my trip," "Includes trip cancellation, trip interruption, . . . and more," or "I understand by declining coverage I am responsible for all cancellation fees and expenses," they "fail[] to disclose information concerning goods or services which was known at the time of the transaction [and] such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Com. Code §17.46(24). Defendants want consumers to think that if they do not buy their "trip insurance," they will not be protected. Proving this will be done predominantly by generalized evidence of Defendants' scheme.

Although §17.50 contains a reliance element, this is a case where the evidence will show that reliance is common to the whole class. This Court has certified classes based on DTPA claims. *See*, *e.g.*, *Durrett v. John Deere Co.*, 150 F.R.D. 555, 557 (N.D. Tex. 1993). Moreover, there are cases that lend themselves to common reliance evidence. In *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004), the Court found that:

> based on the nature of the misrepresentations at issue, the circumstantial evidence that can be used to show reliance is common to the whole class. That is, the same considerations could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations.

*Id.* at 1259.

This is such a case. The nature of Defendants' misrepresentations (considering their timing,

form, and place) will establish that *all* class members relied on the offer as displayed and clicked *twice* to purchase the trip insurance. This assent by clicking is even more compelling evidence of reliance in this case because Defendants have already argued that clicks matter, even when they are not conspicuously displayed. For example, in its Motion to Transfer [ECF 33], AA argues that by clicking "I agree to the AAdvantage terms/conditions," Plaintiff "expressly affirmed" and "affirmatively marked" (relied, in other words) an agreement two pages removed from the click. [ECF 33, p.5]. It is hard for Defendants to make a credible argument that Plaintiff relied on a forum selection clause contained in a hyperlink-within-a-hyperlink *but not* on a conspicuously presented offer of insurance where consumers have to click twice to purchase it, and have it in front of them.

### 2. A class action is superior to other methods for adjudicating the controversy.

Rule 23(b)(3) lists the following matters as pertinent to a finding of superiority:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The superiority analysis is a "comparative process," in which the court "ought to assess the relative advantages of alternative procedures for handling the total controversy." *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013). Variations in state law are important in the superiority analysis. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996). The Fifth Circuit treats manageability as part of the superiority analysis. *See Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 425-26 (5th Cir. 2004). Additionally, "the class sought to be represented must be adequately defined and clearly ascertainable." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012).

Here, the class members have a clear interest in having a single, unified action given that the majority of the claims are too small to warrant individual litigation. Since Texas is the forum selected by Defendants, it is clearly the most appropriate forum for class members to adjudicate their class claims. Plaintiff's claims in the Amended Class Action Complaint do not lend themselves to any conflict of law issues: Plaintiff has claims for unjust enrichment under Texas and Florida law, violation of Florida and Texas statutes, a federal RICO claim, and a declaratory action.

The proposed class is also manageable and ascertainable. The Nationwide Class consists of all consumers who purchased Allianz's trip insurance policy in AA's website—an easily identifiable group from records in the possession of Defendants. Moreover, since the purchase of a policy is necessarily linked to the purchase of a flight—for which AA requests identifying information—each individual plaintiff will be ascertainable. Since membership in the class is by virtue of the purchase of a policy in AA's website and there are only three defendants in the case, the class is manageable. The Texas and Florida subclasses are for the same reasons, similarly manageable and ascertainable.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Ibaldo Arencibia requests that the Court enter an order determining that this action be certified as a class action pursuant to Fed. R. Civ. P. 23.

Dated: November 2, 2020

Respectfully submitted,


By: *s/Eduardo A. Maura*
Eduardo A. Maura, Esq.
Florida Bar No. 91303
Luis F. Quesada, Esq.
Florida Bar No. 1010305
**Ayala Law, P.A.**
2490 Coral Way, Ste 401
Coral Gables, FL 33145

Telephone: (305) 570-2208
Facsimile: (305) 503-7206
Email: eayala@ayalalawpa.com

Felipe Fulgencio, Esq.
Florida Bar No. 95961
**Fulgencio Law, P.L.L.C.**
105 S Edison Ave
Tampa, FL 33606
Telephone: (813) 463-0123
Facsimile: (813) 670-1288
Email: felipe@fulgenciolaw.com

Roger L. Mandel, Esq.
Texas Bar No. 12891750
**Jeeves Mandel Law Group, P.C.**
2833 Crockett St, Ste 135
Fort Worth, TX 76107
Telephone: (214) 253-8300
Facsimile: (727) 822-1499
Email: rmandel@jeevesmadellawgroup.com

*Attorneys for Plaintiff Ibaldo Arencibia*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and any accompanying documents were filed on November 2, 2020, with the Clerk of Court using the Court's CM/ECF system, and were served on all counsel or parties of record in a manner authorized by Fed. R. Civ. P. 5(b)(2).

By: *s/Eduardo A. Maura*
     Eduardo A. Maura, Esq.

26