```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                    CASE NO. 1:20-cv-24694-BB
 3

 4   IBALDO ARENCIBIA,

 5           Plaintiff,                    March 3, 2021
                                           9:32 a.m.
 6           vs.

 7   AGA SERVICE COMPANY, et al.,

 8           Defendants.                   Pages 1 THROUGH 48

 9   _____

10
                      TRANSCRIPT OF MOTION HEARING
11                     VIA THE ZOOM PLATFORM
                   BEFORE THE HONORABLE BETH BLOOM
12                  UNITED STATES DISTRICT JUDGE

13
     Appearances:
14
     FOR THE PLAINTIFF:   AYALA LAW, PA
15                        EDUARDO AYALA MAURA, ESQ.
                          2490 Coral Way, Suite 401
16                        Miami, Florida 33145

17
     FOR THE DEFENDANT:   STACK FERNANDEZ & HARRIS, PA
18                        BRIAN J. STACK, ESQ.
                          LAZARO FERNANDEZ, JR., ESQ.
19                        1001 Brickell Bay Drive, Suite 2650
                          Miami, Florida 33131
20

21   COURT REPORTER:      Yvette Hernandez
                          U.S. District Court
22                        400 North Miami Avenue, Room 10-2
                          Miami, Florida 33128
23                        yvette_hernandez@flsd.uscourts.gov

24

25
```

```
 1        (Call to order of the Court, 9:32 a.m.)

 2             MR. STACK:  Good morning.

 3             THE COURT:  Good morning.

 4             MR. AYALA MAURA:  Good morning.

 5             THE COURT:  Good morning to everyone.

 6        I hope everyone is safe and well.  And let's go ahead

 7   and call the case and we'll get started.

 8             COURTROOM DEPUTY:  Calling Civil Case Number 20-24694,

 9   Arencibia v. AGA Service Company, et al.

10        Counsel, please state your appearances for the record,

11   starting with Plaintiff's counsel.

12             MR. AYALA MAURA:  Eduardo Ayala Maura for Plaintiff

13   Ibaldo Arencibia.

14             THE COURT:  Good morning.

15             MR. STACK:  Good morning, Your Honor.  Brian Stack and

16   Larry Fernandez of Stack Fernandez & Harris, on behalf of

17   Defendants AGA Service Company, doing business as Allianz

18   Global Assistance, and Jefferson Insurance Company.

19             MR. FERNANDEZ:  Good morning, Your Honor.

20             THE COURT:  All right.  Good morning to each of you.

21   And I thank you for appearing this morning.

22        The Court did set for hearing Docket Entry 107, which

23   is the Defendants' motion to dismiss the amended class action

24   complaint.

25        I have had the opportunity to review the briefings, as
```

```
1    well as the case law that was cited.  I certainly do not need

2    you to restate what is already contained within the briefing,

3    but I do have some questions.  And just for the record, the

4    Motion to Dismiss seeks to dismiss Counts 1, which is the

5    request for declaratory relief as to all Defendants; Count 3,

6    the claim for unjust enrichment against Allianz and Jefferson

7    on behalf of the Florida subclass; Count 4 is the violation of

8    the Florida Deceptive and Unfair Trade Practices Act on behalf

9    of the Florida subclass; and Count 5 is the RICO claim against

10   all the Defendants.

11        And perhaps we can start with the RICO count.  And

12   obviously the Defendant bears the burden with regard to this

13   motion.  So Mr. Stack -- I'm not certain if it's Mr. Stack or

14   Mr. Fernandez who will be making the argument -- Mr. Ayala, in

15   his response, argues that the Court is not bound by the

16   findings of Judge O'Connor from the Northern District of Texas,

17   but I do note that that RICO count related to all the

18   Defendants.  So if you can just advise the Court why you

19   believe the law of the case doctrine should apply or the

20   Plaintiff should be precluded from proceeding with a RICO claim

21   with regard to Allianz and Jefferson.

22        MR. STACK:  Yes, Your Honor.  And I will be making the

23   argument.

24        The RICO count is defective for a number of reasons,

25   not only those that were identified by Judge O'Connor.  Judge
```

1    O'Connor specifically deferred on making any specific

2    determinations under Florida law with regard to the Allianz

3    Defendants -- Allianz and Jefferson.  And I'll refer to them in

4    that fashion, unless I need to specify one or both.

5         But with regard to the RICO claim, which -- the gist

6    of which is that there was an enterprise between Allianz,

7    Jefferson, and American Airlines to engage in mail fraud, wire

8    fraud, and money laundering.  The Judge did address the

9    sufficiency of those allegations head on.  And although his

10   dismissal order was limited to American Airlines, for the

11   reasons the Judge articulated in his order of dismissal,

12   believing that it was more appropriate for the Allianz

13   Defendants' motion to be adjudicated by this Court, the basis

14   for that order of dismissal plainly applies to the allegations

15   that are common to both American Airlines and to the Allianz

16   Defendants.

17        And what is significant from Judge O'Connor's order is

18   he makes two binding determinations, final orders, which

19   obviously have not been appealed, and to which the law of the

20   case doctrine, or collateral estoppel, or, in our view, as well

21   res judicata applies.  And the two binding determinations that

22   he makes is that the claim by Plaintiff is that the enterprise,

23   the alleged RICO enterprise, made statements like, quote,

24   yes -- and I'm quoting from Page 14 of Judge O'Connor's

25   order -- that the enterprise allegedly made statements that:

1    "Yes, protect my trip, include trip cancellation, trip

2    interruption," and that those representations violate or

3    constituted mail or wire fraud because it portrayed the

4    insurance product being offered as broad, no-fault travel

5    protection.

6            And Judge O'Connor addresses that claim head on, and

7    says:  "However, the statements that Allianz put in its offer

8    box, the statements that Allianz -- both Jefferson and Allianz

9    made, warned Arencibia, the Plaintiff, that the terms -- that

10   terms and conditions and exclusions apply," citing to the

11   policy declaration of coverages, "that Allianz provided a clear

12   disclosure through a hyperlink to view all of those terms and

13   conditions, that Allianz provided to the Plaintiff at the time

14   of purchase" -- at the time of purchase -- "with direct access

15   to a detailed 36-page policy that," quote, "accurately

16   reflected the nature, essence, and substance of what it

17   covers."

18           And furthermore, that the Plaintiff emailed -- I

19   apologize -- that the Defendants emailed -- Allianz emailed the

20   Plaintiff another link to those terms, and that the Plaintiff

21   had an opportunity to review those terms and cancel them within

22   10 days.

23           And so, Judge O'Connor says, at Page 14, carrying over

24   to Page 15 of his order, quote:  "Based upon the express

25   language of the travel insurance policy, the Court concludes

1    that Arencibia cannot plausibly allege a material

2    misrepresentation by American."

3           Now, the order is directed only to American.  But the

4    misrepresentations that Plaintiff bases his entire claim on are

5    made by Allianz -- are allegedly made by Allianz and Jefferson,

6    and the disclosures are only made by Allianz and Jefferson.

7    Therefore, it is clear that that particular finding in the

8    order is determinative of the RICO claim as it stands now

9    before Your Honor.  And under principles of res judicata and

10   collateral estoppel, and law of the case, Plaintiff has no

11   ability to reargue that before Your Honor.  The Plaintiff

12   cannot ask this Court to second-guess that binding

13   determination that he elected not to appeal in the Fifth

14   Circuit.

15          Beyond all of that, Your Honor, separate and apart

16   from the rejection of any suggestion of mail fraud or wire

17   fraud, Judge O'Connor also very flatly made the determination

18   that there's absolutely no claim -- viable RICO claim for money

19   laundering.  And really, the Plaintiff apparently has abandoned

20   any assertion of money laundering.

21          THE COURT:  It does appear --

22          MR. STACK:  And then, lastly, Judge O'Connor makes a

23   determination that there is no RICO injury and determines that

24   the Plaintiff got precisely what he bargained for, a policy

25   subject to terms and conditions, which he was able to read,

1   which he was able to understand, which he, in fact, admits he

2   did read before he bought the policy.  There is a constant

3   suggestion throughout the opposition papers that it's improper

4   for the Court to conclude that the Plaintiff was on notice or

5   should be on notice after clicking through three hyperlinks.

6   That is a red herring here.  The Plaintiff admits that he

7   clicked through those hyperlinks, that he got to the policy.

8   And he also does not deny -- and this is in addition to what

9   Judge O'Connor has already determined -- he does not deny that

10  he got the policy after he purchased his American Airlines

11  ticket, that he could cancel that American Airlines ticket

12  within 24 hours, he had the ability to read the policy.

13        The fundamental flaw which infects the RICO claim, as

14  well as the other claims, is Plaintiff's inability to accept

15  the black letter principle in Florida, as it exists in Texas,

16  that when a Plaintiff relies on a misrepresentation, whether it

17  be mail fraud, wire fraud, or any other type of common law

18  fraud, that is contradicted by the clear and unambiguous terms

19  of the ultimately executed contract, the contract prevails over

20  those alleged misrepresentations.

21        Plaintiff would rather bring before this Court a

22  claim, whether it's couched in RICO, unjust enrichment, or

23  deceptive and unfair trade practices, that this Court should

24  not permit somebody to make a misrepresentation and then

25  clarify it somehow in the contract.  But that is not what the

1    law is.  His wishful construction of a claim of consumer

2    protection claims and asking the Court to become the consumer

3    protection regulatory authority does not pass muster under

4    Florida law.

5          That is why -- that is why the statutory scheme for

6    regulation of insurers rests exclusively with the Florida

7    Department of Insurance and its associated agencies.  And that

8    is why Congress, in adopting the McCarran-Ferguson Act, said:

9    "We are not going to impose the will of Congress under any

10   federal enactment on the regulatory authority of each of the

11   states, unless the particular federal act is an insurance

12   regulatory act."  And clearly everyone can see RICO is not an

13   insurance regulatory act.

14         And for that reason, although Judge O'Connor doesn't

15   reach McCarran-Ferguson, it, I think, explains Judge O'Connor's

16   reasoning on the mail and wire fraud issues.  But in addition,

17   it explains why this kind of claim, which Plaintiff is

18   attempting to assert on the basis of some type of consumer

19   protection construct, cannot stand under both state law --

20   Florida state law or under federal law, the McCarran-Ferguson

21   Act.

22         We're not writing on a blank slate here.  Two courts

23   have specifically addressed the issue of McCarran-Ferguson in

24   the context of a claim predicated on conduct that would

25   otherwise violate the Florida Unfair Insurance and Deceptive

1    Practices Act, the very claims that Plaintiff is making here.

2    And both Judge Moreno and Judge Rosenberg, in detail, carefully

3    analyzed opinions.  Kondell and In Re Managed Care address why

4    in the context of Florida law that RICO claim cannot stand.

5         So I've gone beyond a mere explanation of Judge

6    O'Connor's order.  And for that, I apologize to the Court.  But

7    I don't think it -- I think it's helpful to look at this RICO

8    claim at a more satellite level, and to understand that Judge

9    O'Connor focused in on the mail fraud, the misrepresentations,

10   the wire fraud representations, and said:  "I don't have to get

11   any further on that because there were none."  There absolutely

12   were none as a matter of objective reading of those documents.

13        THE COURT:  Mr. Stack, I want to stay on your argument

14   with regard to the rights are precluded under 626.9631, because

15   it would appear to the Court -- and I'm speaking now of the

16   common law, the unjust enrichment claim -- that -- if you can

17   advise the Court how that claim would fail if the statute

18   expressly states that those provisions are cumulative to the

19   rights under civil and common law.  And if you're making that

20   argument, does that mean that an insured would never have a

21   claim against an insurer for any alleged misrepresentation?

22        MR. STACK:  I believe that is the essence of how the

23   Florida statutory framework is constructed, Your Honor.  And I

24   would like to point out that counsel does rely on -- I'm always

25   swimming in a sea of paper, and I apologize for that.

```
 1            THE COURT:  Aren't we all these days?

 2            MR. STACK:  You know, I know we're paperless, but I'm

 3    never paperless.

 4            And there are two things to note, Your Honor, from the

 5    statutory section that you have just referenced.  And I'm just

 6    going to pull it up on my computer, because I obviously -- I'm

 7    buried in it.  But I am prepared to address that.

 8            And it is the following, Your Honor:  First of all,

 9    under 624.155, which counsel has raised, he references, in

10    624.155, Subsection (a), that:  "The civil remedy specified in

11    this section does not preempt any other remedy."  That's one of

12    his arguments.  But when one looks at 624.155, that is the

13    provision that says there are only certain statutory violations

14    for which a private litigant can assert a statutory cause of

15    action.  And everybody admits now that there is no private

16    right of action for unfair sales practices in the sale of

17    insurance products.  There is no statutory right of action.

18            And that building on the prohibition for those claims,

19    that's where the Eleventh Circuit in the Buell decision said --

20    and in the Joseph decision -- Joseph acknowledges there's no

21    private statutory claim for an aggrieved or an alleged

22    aggrieved purchaser of insurance products.  Buell takes that

23    one step further and says:  "Not only is there no statutory

24    private right of action, you can't make an end run around that

25    bar."  Under the doctrine that -- where the legislature has
```

1    specified where there are rights to assert a private right of

2    action, the omission to allow the other private rights of

3    action means they're barred, and the Eleventh Circuit said:

4    "You can't bring it."

5           So what is counsel's explanation to that?  They can't

6    really distinguish the Eleventh Circuit authority.  He

7    criticizes it, claims it's been overruled by the Eleventh

8    Circuit in Silver Star.  Judge Middlebrooks addresses that.

9    Many courts have addressed it.  And Silver Star does not

10   overrule Buell, either expressly or implicitly.  The Silver

11   Star court knew about its own determinations in Buell.  If

12   Silver Star were intended to overrule Buell, it would have

13   overruled Buell.  It hasn't.  And the explanation by Judge

14   Middlebrooks and many others that Silver Star allowed an unjust

15   enrichment claim because the legislature under that

16   non-insurance statute -- it was a licensing statute, not an

17   insurance statute -- specifically intended for there to be a

18   right of action to assert claims for healthcare payments that

19   were unlawfully received by a healthcare clinic in violation of

20   those healthcare statutes.

21          The other statutory section that you referenced, Your

22   Honor, says that nothing in the insurance code will abrogate

23   any right of a private litigant merely because the state has

24   asserted its right as a regulatory authority.  But it goes on

25   to specifically say that:  "We're not granting any other rights

1    of action."

2            So counsel for Plaintiff is misreading both of those

3    statutory sections.  They're not savings clauses which say:

4    "On the one hand, you may not assert a private right of action,

5    but on the other hand, you can assert any other cause of action

6    that you might possibly have under common law."  If that were

7    the case, then the three judges on the Buell panel forgot to

8    read the statute, and that clearly did not occur here.  What

9    they're saying, again, just so that I'm clear with the Court,

10   is that when the state asserts its authority to regulate, the

11   assertion of that authority cannot be deemed by statute to

12   impair a private litigant's right otherwise to assert whatever

13   rights it may have.

14           So if a state agency, here, for example, were to

15   enforce one of its regulations or statutory prohibitions on

16   improper conduct, and a private litigant were otherwise

17   entitled to bring a private statutory right of action, that

18   means that the private litigant can bring that action even

19   though the state has also sought enforcement authority.

20           But here, the state is the only one that can enforce

21   the regulations that prohibit the fraud in connection with the

22   sale of insurance productions.  There is no private right of

23   act and there is no savings clause, not even under 624.155,

24   which says you can now bring that claim.  It simply cannot be

25   construed in that fashion.  And the Eleventh Circuit has made

1    it crystal clear that you can't do it.  And of course, the

2    Eleventh Circuit is not the only court to address that very

3    issue.  I've cited other authorities.

4            So the -- and in fact, in our motion to dismiss we

5    cite multiple cases that reach the same conclusion in various

6    different contexts.  And I won't recite them all, but I can

7    point the Court to the citations, which are at Page --

8            THE COURT:  And certainly, I've read the case law,

9    including with regard to the FDUTPA and the Zarrella case and

10   the other cases that are cited.

11           MR. STACK:  Yes.

12           THE COURT:  But staying with the unjust enrichment,

13   because obviously the argument is that there can be no cause of

14   action for damages, you know, based on the false or deceptive

15   representations regarding the insurance coverage.  But you've

16   also made the argument that since there is an actual contract

17   and your clients are parties to the contract.  Can you just

18   advise the Court when you believe on behalf of the Defendants

19   the contract came to fruition?  I know that there were four

20   separate steps to this process that Mr. Arencibia went through.

21   But can you advise -- because it is -- and I think, in looking

22   at the Bell case, that we can agree that this is a browse-wrap

23   agreement.

24           But at what point in time do you believe that the

25   contract came to fruition?  Was it the clicking of "yes" on the

1   American Airlines site or at what point do you believe the

2   contract was formed?

3          MR. STACK:  When the consumer clicks that he wants to

4   buy the policy, then, following that, if I understand the

5   process completely -- then a credit card transaction will be

6   effectuated and the policy will be issued, and issued

7   immediately, and at that time the contract comes into

8   existence.  Subject, of course, to the right of the consumer to

9   cancel that policy for any reason 10 days thereafter.  And in

10  this case, counsel admits that he received an email providing a

11  copy of the purchased policy, and I believe that's referenced

12  in the attachments to the amended complaint.

13         So there's no denying -- and counsel doesn't deny that

14  there was an insurance policy.  He doesn't deny the law which

15  says you can't bring an unjust enrichment claim if you have a

16  contract.  His explanation, which only comes up in his

17  surreply, is:  "Well, we think it's an invalid contract.  This

18  contract was induced by fraud.  It's invalid."

19         Well, let's be clear what he's arguing.  The contract

20  is either a contract that he has ratified and sued to collect

21  damages on, which is what he's done in the case.  He has sought

22  damages in connection with the alleged fraud, the alleged

23  unfair and deceptive trade practice, or the alleged criminal

24  activity under the RICO count.  He hasn't sued to rescind the

25  contract.

1          This notion of what is an invalid contract, that is if

2    somebody sues and say:  "This contract is not enforceable.  It

3    has no legal effect whatsoever."  And there is no law out there

4    that says that a contract that is procured by fraud is invalid.

5    To the contrary, the law says when you sue for damages you are

6    ratifying the existence of the contract and you seek damages.

7    You have the election of remedies to seek rescission of that

8    contract.

9          There is no claim for rescission in this contract --

10   in this amended complaint.  He's not seeking to do that.  All

11   of his claims are damage claims.  And by inserting in a offhand

12   remark in his declaratory judgment claim that:  "I think this

13   contract is null and void," again, I think Plaintiff ignores

14   the fact that the declaratory judgment count is not a cause of

15   action.  It doesn't provide him any substantive rights.  He

16   can't, through a declaratory judgment claim, seek relief that

17   he's not entitled to.  The relief that he seeks is in the

18   substantive counts.  And we all know that if those substantive

19   counts fail, the dec count must be dismissed.

20         So there is no claim -- he can't avoid the fact that

21   he has a contract.  He admits it.

22         THE COURT:  Thank you, Mr. Stack.

23         I'm actually going to turn some of the questioning

24   over to Mr. Ayala.  Because Mr. Ayala, if the Court looks at

25   the allegations in your complaint, one of the allegations is

1    that the Plaintiff actually made a claim.  And I'm questioning

2    how the making of a claim under the policy for coverage isn't a

3    concession by the Plaintiff that there, in fact, is a contract

4    that exists.  And the reason I ask that is that there's a

5    plethora of case law that stands for the proposition that

6    reliance upon any claimed misrepresentation that is directly

7    contradicted by the express unambiguous terms of a written

8    agreement is not justified as a matter of law.

9         So I understand that at this point by asserting these

10   claims for FDUTPA and unjust enrichment that the Plaintiff is

11   seeking to disavow this contract.  But the allegations are that

12   the Plaintiff admits that there was a contract and actually

13   made a claim under that policy for coverage, that contract.

14        So can you advise the Court what case law would the

15   Court look to that would tell the Court that the Court should

16   now accept an argument that there is no valid contract.

17        MR. AYALA MAURA:  Thank you, Your Honor.

18        The fact that Arencibia made a claim in the context of

19   the complaint is simply a logical consequence of the sequence

20   of events in which, had he not made a claim, he will have never

21   known that he was, as it's his impression -- that he was lied

22   to in the offer for purchase of this product.

23        So it doesn't go to the idea that counsel argues, he

24   admits, yes, this is a policy dispute, et cetera.  It's the

25   fact that makes him aware and why he files this actual

1   complaint.  And I don't have the case law on top of my head

2   right now, but that's what I can tell the Court.  Because

3   without that, Arencibia would never know.  If he didn't have to

4   cancel the flight, he would have never made a claim and he

5   would have never known, like most consumers, that this product

6   is extremely narrow and it's essentially a medical emergency

7   product that has nothing to do with unexpected -- or trip

8   protection or trip cancellation, like the express

9   representations say in the offer of insurance.

10          And if anything, if there were to be an agreement

11   here, that agreement's terms would be squarely -- squarely the

12   offer of insurance that says:  "We cover trip cancellation,

13   trip interruption and baggage," not the other terms that are in

14   a hyperlink and after a hyperlink.

15          When counsel says that those terms were available,

16   that's factually incorrect.  They are available once you pay.

17   If you don't pay, then you have to go through the process that

18   we describe in our motion, which is fact-intensive and you go

19   through four different pages and hyperlinks.  And by the way,

20   Judge O'Connor made no determination as to that.  Judge

21   O'Connor --

22          THE COURT:  I don't know if that directly answers the

23   Court's question.  Because you have alleged that there was a

24   policy of insurance.  You have alleged that Mr. Arencibia made

25   a claim under that policy of insurance.

```
1              MR. AYALA MAURA:  We do, Your Honor.  But in the

2     context of contrasting the offer versus product, which is at

3     the core of Arencibia's claim -- the claim is:  "You offer a

4     policy that covers nothing and that's how we were (audio

5     distortion) into this."  In other words, the claim is the

6     Defendants cannot offer trip insurance, and then in a hyperlink

7     after a hyperlink exclude 99.9 percent of instances of

8     cancellations.

9              So it's a misrepresentation.  It's a lie.  It's -- and

10    consumers, that's the impression they get.  They feel scammed,

11    they feel robbed, and that's why Arencibia brings this claim.

12    But that doesn't, at least from our standpoint, Your Honor --

13    and I don't know at what point in the complaint -- I can't see

14    one of the paragraphs that admits that we enter into a

15    contract.

16             Quite the contrary, on Paragraph 45, Arencibia alleges

17    that he and the Defendant had different things in mind when

18    they enter into this contract.  And in that context, also, you

19    know, leading to the declaratory action, is that based on this

20    discrepancy of view of what this was, based on the

21    misrepresentation of insurance, that we request that this

22    contract should be declared null and void and the rights of

23    these consumers should be asserted by the Court.

24             So I don't know if that answers your question, but

25    that's kind of like how we present --
```

```
1          THE COURT:  All right.  Well, let me ask you about the

2     actual -- and we'll go through some of the allegations.

3          And specifically referring to Paragraph 19, you stated

4     that:  "When he first saw the insurance option, Arencibia was

5     led to believe that it was simple, quote/unquote, insurance in

6     the plain meaning of the word."  Can you advise the Court what

7     is "simple insurance"?

8          MR. AYALA MAURA:  The Plaintiff, faced with this

9     offer, and in the context of that paragraph, understood the

10    impression -- the net impression he obtained is one that was --

11    was one that the price of his flight was covered.  And we read

12    this in the context of the section where -- and it's the

13    footnote, where Allianz says:  "I choose not to protect my

14    price purchased."  And they -- in each and every offer, they

15    put the exact price.

16         So by they putting the exact price, consumers get the

17    impression that the trip is insured.  Rather than, you know,

18    being a medical emergency insurance, like most other insurance

19    providers describe.  They offer this as this is a medical

20    insurance, as opposed to a broad trip insurance, trip

21    protection, and more.  That's the context of that sentence,

22    Your Honor, as far as --

23         THE COURT:  Where would the Court -- and I apologize.

24    Where would the Court find the definition of "simple

25    insurance"?
```

```
 1              MR. AYALA MAURA:  There's no definition of "simple
 2    insurance."  This is in many ways -- this case in many ways
 3    turns into an English language situation.  Right?  When the
 4    Defendants offer trip insurance, trip protection, trip
 5    coverage, and more, when Defendants offer this like that, what
 6    do consumers understand?  We cited to the case of -- a Seventh
 7    Circuit case that defines that the net impression of consumers
 8    is what controls.  And if consumers -- and we have the polling,
 9    Your Honor.  We've done the research.  If consumers are
10    understanding that this product is X, that controls on a case
11    that alleges misrepresentation on advertising and a
12    misrepresentation of offer.
13              And the Defendants' position that the contract where
14    we tricked you into entering blocks all your claims would not
15    be viable, just like Your Honor was mentioning earlier that
16    under the Defendants' view they would never be liable for
17    anything.  It doesn't matter how much of a scam or outrageous
18    the fact pattern would be.  That simply can't be the case.  And
19    it's not supported by even FDUTPA itself, which very broadly,
20    and in two sections, permit common law causes of actions.
21              THE COURT:  So Mr. Ayala, if you can just advise the
22    Court where are the misrepresentations.  I understand that your
23    client believed that this was a, quote/unquote, simple
24    insurance.  And it certainly appears to be belied by the actual
25    policy that was emailed to him.  But perhaps walk the Court
```

1    through the four steps that Mr. Arencibia took.  And at what

2    point -- can you just set forth where the deceptive or

3    misrepresentations were made?

4          MR. AYALA MAURA:  Our allegations are that the offer

5    of insurance, the ones laid out in the paragraph Your Honor was

6    addressing, is the misrepresentation.

7          THE COURT:  So the sole misrepresentation is where it

8    states:  "Yes, protect my trip" -- I understand that this is a

9    substantially similar, but let's assume it's $57.06 -- and this

10   is on the footnote on Page 4 of the complaint -- "includes trip

11   cancellation, trip interruption, travel and baggage delay, and

12   more."  Is that the misrepresentation?

13         MR. AYALA MAURA:  Yes, Your Honor, along with the

14   other statements in that same image as well, along with -- we

15   can go to the email confirmations where Allianz states:  "Thank

16   you for protecting your trip."  At no point there is disclosure

17   that this policy is strictly related to catastrophic events and

18   medical emergencies.  There's no disclosure of that ever.

19         So -- and the -- at this stage, we're unable to

20   provide evidence of, you know, what consumers are understanding

21   of this, evidence of what other similar companies -- or how

22   they disclose this.  But on the plain reading of these words,

23   there's no qualifiers.  There's no qualifiers as to the

24   narrowness of this policy.  And this is what Arencibia

25   understood, and like him, many of them --

```
 1            THE COURT:  Well, I just want to go back.  Because

 2    we're now on step one.  So on step one, you're claiming the

 3    misrepresentation was:  "Includes trip cancellation, trip

 4    interruption, travel and baggage delay, and more."  And

 5    Mr. Arencibia believed that to be a full coverage for any

 6    cancellation for any reason?

 7            MR. AYALA MAURA:  Correct, Your Honor.

 8            THE COURT:  All right.  And then the -- that step also

 9    included -- and we -- I believe the law supports that this is a

10    browse-wrap agreement, correct?

11            MR. AYALA MAURA:  Correct.

12            THE COURT:  And on that page, on the American Airlines

13    website, it states:  "Terms and conditions and exclusions

14    apply, see coverage details."

15            Can you advise the Court how Mr. Arencibia was induced

16    by the offer to desist from reading the policy when the offer

17    box was on that same page -- if we look at the proximity, it

18    was right there below -- where it disclosed:  "Terms,

19    conditions and exclusions apply"?  What are the facts that

20    would support that the Plaintiff was induced by the offer to

21    desist from reading the policy?

22            MR. AYALA MAURA:  That -- two things, Your Honor.

23    First, Arencibia wouldn't have been able to read the policy

24    unless he paid.  That's number one.

25            THE COURT:  So is that a fact?  That if Mr. Arencibia
```

1    clicked on:  "Terms, conditions, and exclusions apply.  See

2    coverage details," that he would have to pay before he was able

3    to read those terms?

4         MR. AYALA MAURA:  If he clicked on that, he would take

5    to a second page.  On the second page, he will have to browse

6    through several links and then go to a next page, which will

7    ask him to select his state of residence.  Once he selected his

8    state of residence, he would get to a next screen, which he

9    will be able to see a sort of generic policy, not his actual

10   policy.

11        So the only way to immediately see his customized

12   policy would be to pay.  He wouldn't have to go through any of

13   the clicks or pages.  So consumers, when they see that bottom

14   thing, and go through the clicks, and see these pages and pages

15   of links and hyperlinks, they are not apprised of the context

16   of this policy.  And this would be very easy to disclose.  If,

17   let's say a hypothetical, Allianz would say here:  "This covers

18   medical events or cancellations for medical reasons," like many

19   other companies do, that would be no problem.  A reasonable

20   consumer could understand:  "Well, this is the minimum

21   coverage.  This covers more, which is detailed under the

22   coverage details, or there is some conditions of payment.  For

23   example, I have to provide evidence of cancellation or I have

24   certain time limits to make a claim," things like that, but not

25   contradict the essence of the policy.

```
 1              Just to put an example, Your Honor, if the Defendant

 2    sells and offers to sell accident insurance, and then there's a

 3    click for details that says that they only cover truck

 4    accidents, okay, and all other accidents are not covered,

 5    that's not an honest representation of what they're offering

 6    and what it covers, when 99.9 percent of events will be

 7    excepted.  That policy should be called truck accident

 8    insurance.

 9              If the Defendant offers a life policy, and the policy

10    covers only maybe gastrinoma cancer deaths, right, it should be

11    a cancer policy.  It shouldn't be a life policy.  That's the

12    essence of this case.  Consumers get misled -- are misled by

13    this representation.  Arencibia, in fact, did and many

14    others -- as we stated in the introduction, the impression of

15    consumers -- and I want to quote to the FTC v. EMA Nationwide,

16    a Seventh Circuit -- Seventh Circuit case -- I'm sorry -- a

17    Sixth Circuit case, that states that:  "The important criterion

18    in determining the meaning of an offer is the net impression

19    that it's likely to make in the general populace."

20              THE COURT:  I just want to continue, because

21    Mr. Arencibia had other opportunities, and I want to understand

22    how he was prevented from reading the policy that set forth the

23    terms and exclusions.

24              So the first step is you're claiming that he had to

25    pay for the policy in order to access the hyperlink to view the
```

1   terms; is that correct?

2          MR. AYALA MAURA:  Yes.

3          THE COURT:  All right.  So after that point -- and

4   you've provided this as part of your amended complaint -- that

5   Allianz provided Mr. Arencibia, at the time of the purchase,

6   with direct access to the 36-page policy.  But you're stating

7   that that was prevented because he had to pay.

8          MR. AYALA MAURA:  That was after payment.  Correct.

9          THE COURT:  All right.  So -- but in other words,

10  Mr. Arencibia was prevented from reading the policy before he

11  paid.  Is that what you're stating?

12         MR. AYALA MAURA:  Well, Your Honor, it's not exactly

13  prevented, but it is a burdensome, difficult, consuming --

14         THE COURT:  Well, either he could or he couldn't.  Was

15  he able to read the 36-page policy if he clicked on the

16  hyperlink "Terms, conditions, and exclusions apply" before he

17  paid for the policy?

18         MR. AYALA MAURA:  I -- honestly, Your Honor, that's a

19  question I can't answer.  Because I would have to see his

20  skill, state of mind, and --

21         THE COURT:  It's just -- it's a factual question.  Did

22  he have to pay before he was able to access the policy under

23  this hyperlink?

24         MR. AYALA MAURA:  Yes.  To see his Florida customized

25  policy, yes.

1    THE COURT:  All right.  Then you're claiming that --

2    and I believe it's Exhibit C -- that he was given the actual

3    policy and he was given 10 days after receiving it to review

4    and cancel without any charge.  Was that part of the -- of the

5    letter to Mr. Arencibia?

6        MR. AYALA MAURA:  Yes, Your Honor.

7        THE COURT:  So I guess I'm not quite clear where the

8    misrepresentation is, if he thought he was getting this simple

9    insurance, but yet he was given the opportunity to review the

10   policy, and he failed to cancel the policy, which tells the

11   Court that there was a valid contract of insurance.  So can you

12   explain to me where the misrepresentation lies.

13       MR. AYALA MAURA:  Our position, Your Honor, is that

14   the 10-day cancellation shouldn't save the Defendant from

15   accurately representing his products.  That, you know, this

16   event happened after -- the critical event for which he needed

17   to cancel the policy occurred, as in many consumers' case,

18   after the 10 days.  Many -- all these flights are purchased way

19   in advance.  So our position is that the Defendant still has a

20   duty to accurately represent in the offer something that

21   matches the contents of the -- of the contract they later sent,

22   and that doesn't exempt them from truthful disclosures.

23       THE COURT:  You stated in your response to the Motion

24   to Dismiss, on Page 6, that the statements that are on the

25   American Airlines website are deceptive because they give

```
 1    reasonable consumers the net impression that the policy
 2    provides broad no-fault protection and coverage.  Can you --
 3    and, in fact, you bullet-pointed the statements.  One is:
 4    "Prepare for the unexpected."  Do you believe that that's a
 5    deceptive or untrue statement?
 6            MR. AYALA MAURA:  Yes, Your Honor.
 7            THE COURT:  "Prepare for the unexpected"?
 8            MR. AYALA MAURA:  Yes, because --
 9            THE COURT:  How is that a misrepresentation or a
10    deceptive statement?
11            MR. AYALA MAURA:  Because a reasonable consumer could
12    understand that unexpected events are covered.  And in this
13    case, this work conflict was an unexpected event and he
14    understood that that was covered.
15            THE COURT:  So that statement in and of itself gave
16    the impression that there was full coverage without any
17    limitations or exclusions?
18            MR. AYALA MAURA:  Our complaint, Your Honor, alleges
19    as a whole all of the representations, they appeal to authority
20    from a reputable travel writer.  The statements putting the
21    amount of the price all give the consumers the impression
22    overall that what they're buying is to insure the flight, the
23    flight purchase price.  And that but for these statements, they
24    wouldn't purchase this.
25            If the Defendant were to disclose:  "This is a medical
```

1    emergency and catastrophic event policy," 90 percent of

2    consumers simply wouldn't buy it.  And it is intentional that

3    they disclose it in this way and that they appeal to authority.

4    And the position where this offer is located -- in other words,

5    consumers cannot choose not to click nothing.  They have to

6    select one or the other.  And it's at the pay window in the

7    American Airlines website.  And they can't go through if they

8    don't click.

9         And the "no" is particularly compelling.  If I choose

10   not to protect my purchase, I will be liable for all the

11   coverage.  So a reasonable consumer could understand that,

12   okay, if I click "yes," then I'm protected.

13        THE COURT:  All right.  Then let me actually address

14   what the Court is concerned with.  And that is that

15   Mr. Arencibia may be bound by the terms of the policy,

16   regardless of whether he actually read them.

17        So you've stated in your response that that statement

18   is untrue, that he's bound by the policy, because there are

19   facts showing circumstances which prevented his reading the

20   paper or he was induced by the statements of others.  And you

21   cited to a district court -- a Florida District Court case of

22   Savoia.  Can you advise the Court what circumstances prevented

23   Mr. Arencibia from reading the policy.

24        MR. AYALA MAURA:  Your Honor, the circumstances that

25   prevented the Plaintiff or a consumer from reading a policy do

1    not necessarily have to be the fact that they could have

2    searched on the Internet for the policy or their physical

3    ability to do that, but the impression that they obtain that:

4    "I don't need to read this because at the very minimum they are

5    providing me protection for the purchased flight in case

6    something happens."

7         So the impression that they give appears to give

8    consumers peace of mind.  And in that sense a reasonable

9    consumer could simply say:  "I don't need to read -- it's not

10   something that I necessarily need to read."  If all consumers

11   had to hire a lawyer to read these policies, these transactions

12   would not be viable to begin with.  So in that context it's

13   that we allege that it was prevented, not like in the physical

14   context that there was a physical impossibility of reading it.

15        THE COURT:  You also stated, in Paragraph 43, that:

16   "Allianz's post-purchase emails are equally misleading.  And so

17   is the deceptive practice of sending the thank-you."

18        So is it the practice or the actual statement on the

19   American Airlines website?

20        MR. AYALA MAURA:  In the context of the entire scheme,

21   Your Honor, the fact that even after -- after the purchase

22   where they get the chance at sending the consumer a whole

23   email, where they could perhaps specify:  "By the way, the

24   purchase you -- the policy you bought only covers X, Y, or Z,"

25   but rather they decide to send a thank-you email for protecting

1      your trip, "now you're protected," in the same line of broad

2      type of disclosures that do not give consumers reasonable

3      notice as to what the actual contents of the policy is.

4              THE COURT:  Well, what is it about the thank-you

5      letter attaching the policy that is, in essence, deceptive?

6              MR. AYALA MAURA:  The fact that it again fails -- this

7      is the situation where the core of the coverage is not being

8      disclosed.  So in another opportunity in an interaction with a

9      consumer, no longer at a short quick-buy window, but in a whole

10     email and letter, they still fail to disclose the contents,

11     where a consumer -- perhaps, if they disclose the truth of the

12     product, they actually may have made use of the cancellation

13     benefit.  But consumers still get the impression that they are

14     buying a broad product.

15             THE COURT:  And you also stated within your response

16     that the insurance is meaningless.  And I understand that

17     Mr. Arencibia is the representative on behalf of a putative

18     class.  But it would appear to the Court that, with regard to

19     the meaningless nature of the policy, if one made a claim for a

20     medical emergency or a companion who traveled that had a

21     medical emergency, is it not the fact that the policy would, in

22     fact, have meaning and have value?

23             MR. AYALA MAURA:  Correct, Your Honor.  But if I may

24     go back to my example, when the exception is what's covered, as

25     opposed to the actual words of what's being offered, this is --

```
 1    the exception is the actual coverage, as opposed to the trip

 2    protection, which is what they offer to consumers.  They know

 3    that these events are rare, and if a consumer knew that --

 4    okay, if my family member has a catastrophic illness, and I

 5    can't travel, a reasonable consumer may not buy that policy.

 6              THE COURT:  I'm having a hard time discerning how the

 7    statement on the American Airlines website is in contradiction

 8    to the plain language of the insurance contract.  And again,

 9    Mr. Ayala, I understand that it's Mr. Arencibia's net

10    impression, but doesn't that net impression need to be

11    reasonable?

12              MR. AYALA MAURA:  Yes, Your Honor.

13              And if we were allowed to do discovery to prove these

14    claims, we will show overwhelming evidence that Arencibia's

15    impression falls under 99 percent of the consumers.

16    Consumers -- if one were to look at the polling and the

17    reviews, 90 percent of consumers think this is an unfair scam.

18    They are all like:  "How is the FBI not on this?"  It's not --

19    you know, I know the Defendants want to portray this as the

20    Plaintiff being a lazy-to-read consumer, and he's being

21    unreasonable, he should have read better.  But that's not just

22    the reality.  The impression of 99 percent of the consumers

23    cannot be the unreasonable one.

24              And that's kind of like the court (audio distortion)

25    we try to allege despite the -- obviously, there is
```

1    contradictions within the language of the policy.  We don't

2    deny that.  We don't go to that the Defendant would like to

3    make this policy contract insurance dispute like a property

4    claim type of thing.  This is not that.  This is a deceptive

5    offer but for (audio distortion) that the consumers would not

6    have enter into this type of product.

7           THE COURT:  So you believe that Mr. Arencibia's net

8    impression and a finding as to whether that's reasonable should

9    be determined based on the subjective beliefs of other

10   individuals that may have purchased insurance through Allianz?

11          MR. AYALA MAURA:  Yes, Your Honor.  Absolutely.

12          Like I was citing in the FTC v. Nationwide case, the

13   net impression is what controls on misrepresentation of offer

14   cases.  And I'll keep quoting to that case:  "Fine print or

15   ineffective disclaimers do not change the message conveyed if

16   the overall net impression is different."  And that's what we

17   would like to prove, and that's what we believe this case --

18   the allegations of this complaint as written describe a

19   mismatch between offer and product that mislead consumers, and

20   that, if anything, should be allowed to proceed to summary

21   judgment or trial so consumers are able to present evidence of

22   the same.

23          THE COURT:  All right.  And am I correct that there

24   were four separate steps, Mr. Ayala, that Mr. Arencibia took to

25   ultimately arrive at the point of purchase?

```
1          MR. AYALA MAURA:  No.  No.  There are four steps that

2    Arencibia would have had to take to access the policy before

3    paying.

4          THE COURT:  So do you believe that at the point that

5    he paid for the policy that at that point there was an

6    agreement?

7          MR. AYALA MAURA:  No.  No.  There was no agreement

8    because there was a misunderstanding as to what the --

9    Arencibia was buying.  Arencibia had the impression that he was

10   buying a broad consumer trip protection product.  And it was an

11   extremely narrow catastrophic event, medical emergency

12   product --

13         THE COURT:  But I thought that you said that the

14   misrepresentation -- or the awareness by Mr. Arencibia that

15   there was a misrepresentation was when he made the claim.

16         MR. AYALA MAURA:  Correct.  That's when he becomes

17   aware that the words don't mean what they say, and --

18         THE COURT:  But that was after he made the claim.  So

19   I guess my question to you is:  When do you believe that there

20   was an agreement?  I understand that you're questioning whether

21   Mr. Arencibia understood the terms of the agreement.  But if

22   Mr. Arencibia made a claim under the policy, when do you

23   believe that the agreement was actually formed?

24         MR. AYALA MAURA:  We -- Your Honor, our position is

25   not that there was an agreement.  Our position is that this
```

```
 1    policy is null and void, like we allege in Paragraph 45 based
 2    on the absence of the meeting of the minds and in our
 3    declaratory action.  Our position is that there is no
 4    agreement, the Court should declare this void, they were
 5    unjustly enriched, and we should get the money returned.
 6            So the answer would be no, there's no agreement at no
 7    point, despite him making a claim.
 8            THE COURT:  All right.  And with regard to the four
 9    steps, that was in order to obtain the actual 37-page policy
10    that set forth the limitations and exclusions?
11            MR. AYALA MAURA:  The generic, non-customized for his
12    state and circumstances policy, there were four different
13    steps.  And I can tell you the details.  First, there's click
14    one on the "Details" link.  Then there's a "Plan Details."
15    That's click number 2, which takes you to two more options,
16    which is "Plan Details" and "Plan Pricing."  If one were to
17    click on -- you know, if one was likely to click on the right
18    one, which would be "Plan Details," that would get you to the
19    33-page generic document before purchase.  It's four pages
20    removed from the actual disclosure screen that we have
21    presented in the complaint.
22            THE COURT:  All right.  I may have -- I'm just going
23    through my notes that I took from the arguments.
24        (Pause in proceedings.)
25            THE COURT:  In addressing the RICO count, Mr. Ayala,
```

1   can you advise the Court with regard to the wire fraud or the

2   mail fraud that you believe is the predicate act?  You agree

3   that the money laundering is not the predicate act, correct?

4           MR. AYALA MAURA:  I don't know off the top of my head

5   if we allege money laundering.

6       (Pause in proceedings.)

7           MR. AYALA MAURA:  The core of our allegations, Your

8   Honor, are that when Allianz transfers money to American

9   Airlines and Jefferson, money that they know is from a policy

10  that is based on a misrepresentation, in violation of the

11  underlying RICO crimes, and that's -- that's a RICO cause of

12  action.

13          THE COURT:  Right.  But if the Court looks at

14  Paragraph 110, with regard to the enterprise, it's -- it

15  includes allegations with regard to the use of the mail and

16  wire facilities.  I just want to make sure I understand where

17  the predicate act is.  Is that what you're claiming, it's wire

18  fraud?

19          MR. AYALA MAURA:  Yes, Your Honor.  The act of

20  transferring the money inter-companies, money that's

21  illegitimately sought, obtained.

22          THE COURT:  And did you want to address the law of the

23  case?  And since this claim is as to each of the three

24  Defendants, Judge O'Connor appears to have analyzed the actions

25  of these three entities with regard to this enterprise.  Can

1    you advise the Court why the Court should not find that Judge

2    O'Connor's findings are not the law of the case and the law of

3    the case doctrine should apply here?

4          This RICO count has already become dismissed against

5    American Airlines.  I don't see that there is a parsing or a

6    distinction between the acts of Allianz and Jefferson versus

7    Allianz, Jefferson, and American Airlines.

8          MR. AYALA MAURA:  Your Honor, our position is that --

9    several.  First, Judge O'Connor explicitly stated that

10   Arencibia's claims and allegations were with Allianz, not with

11   American Airlines.  Second, Judge O'Connor, throughout his

12   opinion, cites the Fifth Circuit Court of Law and Texas cases,

13   and Judge O'Connor was deciding the case against American under

14   Texas law.  If Judge O'Connor would have, as the Defendant

15   argues, already decided this thing, he would have said so in

16   his opinion, that there was no RICO case either against

17   Allianz.  There is.  And we've cited precedent for that

18   proposition and how this is supported.

19         And finally, Your Honor, Judge O'Connor did not go

20   into the allegations, as did Judge Reese, I believe

21   at initial -- I'm sorry -- Judge Cooke, in -- originally in the

22   Southern District, into the allegations that we just discussed

23   today as to the accessibility and the type of disclosure that

24   Allianz gave consumers on the policy, as to did consumers have

25   this policy accessible.  Judge O'Connor did not go in detail as

1    to that.  He was never exposed to the four-prong process that

2    consumers actually have to go through, because he was analyzing

3    this from the lens of American Airlines and explicitly decided

4    to not bring it back here for a hearing on these matters.

5          And as far as the RICO count, Your Honor, there is

6    more decisions in the Southern District of Florida -- I mean,

7    even if we consider -- even after considering the Eleventh

8    Circuit decision in Silver Star; the decision in Dolan from

9    Judge Scola; the decision in Hucke, by Judge Rosen [sic]; the

10   decision in Pincus by Judge Marra; the decision in Montoya by

11   Magistrate Goodman, all support the idea that there is

12   clearly -- following the precedent of Humana, there's clearly a

13   permissible RICO cause of action and that does not impair the

14   Florida regulations, Florida insurance regulations, as long as

15   there is no contradiction and there's other bases for these

16   claims.  And that's what we allege, Your Honor, that regardless

17   of the Florida insurance code -- if the Florida insurance code

18   didn't exist, the Plaintiff, based on the allegations, would

19   still have a cause of action, based on unjust enrichment, based

20   on Florida deceptive practices on common law claims.

21         The cases cited by the defense, specifically, for

22   example, the Joseph case, the Joseph case, which was a pro se

23   case that was dismissed on procedural grounds, and that had a

24   claim directly in contradiction of the FDUTPA statute, it's

25   inapplicable for that reason.  We don't have a claim under the

1    insurance code.  There's only three claims, plus a declaratory

2    act here.

3           Similarly, the case that the Defendant cites, the

4    Buell case, the Eleventh Circuit Buell case.  That case was a

5    sliding case, was addressing the pricing of insurance, is

6    inapplicable here.  We have no issues with their prices or

7    policies.  We're not engaging in that analysis or claims.  This

8    is about -- this is a straightforward misrepresentation, unjust

9    enrichment case, consumers are deceived and should be returned

10   their money.

11          And the Dolan decision by Judge Scola also

12   contemplates that a RICO cause of action can proceed forward,

13   as long as it's not -- the underlying premises for the RICO

14   case are not FDUTPA type of violations, which is not in this

15   case.  We don't cite to that statute.  We don't allege any

16   violation regarding to pricing, sliding, combining policies, et

17   cetera.

18          And so in the case of -- the majority of the cases

19   actually, Your Honor, support the idea that a RICO count is

20   permissible, even if assuming arguendo the FDUTPA statute is

21   involved eventually.

22          THE COURT:  All right.  And I believe you've alleged

23   the racketeering activity with regard to the enterprise.  I

24   believe that the briefing speaks of the business relationship

25   versus a RICO enterprise.  I think that's a finding that the

1    Court needs to make based on the allegations.

2            Is there anything further, Mr. Ayala?

3            MR. AYALA MAURA:  No, Your Honor.  Thank you.

4            THE COURT:  Mr. Stack?

5            MR. STACK:  Your Honor, counsel's argument and

6    responses to Your Honor's questions demonstrate two inherent

7    problems with this case.  One, is that this case has been

8    brought as a putative class action, where Mr. Ayala has now

9    admitted that the claims are based upon subjective impressions

10   and determinations made not just by Mr. Arencibia, but by

11   others that he would purport to include in the class.  And

12   those kinds of claims are never suitable for class

13   determination.  And whether or not the Court were to permit

14   this complaint to stand on any of these claims, the class

15   action allegations should be dismissed summarily because of the

16   fatal admissions just made.

17           Secondly, the responses to many of the Court's

18   questions by counsel inject facts that are not pled and are

19   inconsistent with the allegations in the amended complaint.  As

20   an example, Mr. Ayala now seems to argue that Allianz and

21   Jefferson did something to prevent or preclude or impair the

22   ability of his client to read the policy.  Yet, when that

23   argument was made in the initial round of briefing, when the

24   matter was before Judge Cooke, and the argument by Defendants

25   was:  "There's no basis for that kind of fraud in the factum

```
1    argument."  Mr. Ayala said:  "We're not making a claim for

2    fraud in the factum.  We're not making the argument that you

3    have impaired our ability to actually read the policy."

4         And it's clear from the email that Mr. Arencibia

5    received from Allianz, which attached a copy of the policy,

6    that we didn't preclude him from reading it.  To the contrary,

7    we sent it to him after he bought the policy.  And Mr. Ayala

8    admits that he could read the actual policy specimen before he

9    purchased.  He makes multiple admissions in his briefing, in

10   his complaint, that he, in fact, could access the policy

11   specimen.  He knew what the terms of the policy were before he

12   actually made payment.

13        Your Honor made a reference earlier in your comments

14   that this is a browse-wrap agreement.  And I think,

15   respectfully, that is not the issue in this case.  This isn't

16   something where Mr. Arencibia is contending:  "I didn't know

17   what the actual terms of the specimen policy were because I

18   can't be required to look at them."  He admits he looked at

19   them.  So the limitations of browse work [sic] agreements are

20   inapplicable here.  They're inapplicable because he made the

21   admission and they are inapplicable because he got the policy,

22   both in specimen form before its issuance and in actual form

23   after its issuance, in sufficient time and in plain English for

24   him to read it.

25        THE COURT:  Well, Mr. Stack, let me ask you with
```

1    regard -- because the browse-wrap would be important for the

2    Court only because of the proximity to the ability to read the

3    policy in this case.  And Mr. Ayala -- and I believe I heard

4    you correctly, Mr. Ayala -- he stated -- although I do not find

5    that within the allegations, but I believe that he's stating

6    that Mr. Arencibia was prevented from reading the policy until

7    he paid for the actual policy, which is inconsistent with

8    Paragraph 24 of the complaint.

9         But can you clarify for the Court -- and I say that,

10   sir, because I'm obviously merely addressing the complaint with

11   the documents that are attached.  So I don't have the ability

12   to truly understand at what point would Mr. Arencibia have been

13   prevented from reading the terms and conditions of the policy.

14   Would he have to pay for the policy?

15        MR. STACK:  No.  That's absolutely false and that's

16   inconsistent with the allegations in the complaint.  There is

17   no allegation that he had to pay for the policy to read the

18   terms of the specimen policy.

19        As Your Honor knows, insurance companies don't issue

20   policies to a prospective buyer.  They provide specimen copies

21   of policies.  And Mr. Ayala has admitted that -- and he admits

22   at Page 4 of his response to the Motion to Dismiss, at the

23   bottom -- he says:  "One of these links, 'Plan Details,' takes

24   the consumer to another website, where they must select the

25   state where they live.  And then they click on yet another link

1    'Plan and Pricing Details.'  Finally, after clicking on three

2    different links," which must have taken all of seven seconds,

3    "he gets to the actual offer of insurance and they get to a

4    document detailing the terms of the insurance policy."

5         So the statement that he had to pay to read the

6    disclosure of the policy is incorrect.  That is not what he's

7    alleged and those are not the facts.  But let's assume that he

8    couldn't read the policy specimen.  He got the policy.  He

9    could read the policy.  He could cancel the policy and get all

10   of his money back from American Airlines and from Allianz.  And

11   what does the policy say?  It -- it is relatively crystal

12   clear.  It's in the plainest English I think that one can use

13   in an insurance policy.  But it says:  "This" -- I'm quoting

14   from the actual policy and from the specimen policy:  "This

15   travel policy covers only the specific situations, events, and

16   losses included in this policy and only under the conditions

17   described.  For this reason, it is known as a," quote, "named

18   perils," close quote, "policy."

19        And then a big warning:  "Note.  Not every loss is

20   covered, even if it is due to something sudden, unexpected, or

21   out of your control.  Only those losses meeting the conditions

22   described in this policy may be covered."

23        So there is no doubt that the policy clearly sets

24   forth the terms, conditions, and exclusions which Mr. Arencibia

25   was on notice of when he first looked at the American Airlines

1    website, when he clicked through and got to the specimen

2    policy, and when he received the policy.

3          One last comment, Your Honor.  It was a comment made

4    by counsel at the very conclusion of his argument.  He says --

5    with regard to unjust enrichment claims and how private

6    litigants in Florida can assert them when they are addressing

7    fraud in the sale of insurance products, we all agree that

8    there is no private statutory right of action to assert a

9    fraud-based claim in the connection with the sale of an

10   insurance product.  The statute is crystal clear, and counsel

11   concedes that point.  He concedes that is the holding in

12   Joseph.  He further concedes that the Buell case specifically

13   says you can't make an end run.

14         Buell involved a fraudulent practice called sliding.

15   Sliding is the practice of requiring an insured to buy more

16   coverage than they anticipated and slipping it into the policy.

17   That sliding is a practice for which there is no private

18   statutory right of action, just as the sale of insurance

19   products fraudulently does not provide a statutory private

20   right of action.  So Buell specifically addresses this

21   situation.

22         But if that were not enough -- and it is enough

23   because the Court is bound by Eleventh Circuit law -- Mr. Ayala

24   says:  "If the Florida Unfair Insurance Trade Practices --

25   Insurance Practices Act did not exist, my client could sue for

1     unjust enrichment, and he could sue for fraud, and he could sue

2     for all these other things."  And you know, I don't necessarily

3     disagree with that argument.  But the fact of the matter is the

4     Florida Unfair Insurance Practices Act does exist.  And that

5     act is what precludes the private rights of action.

6          Imagine what precedent would be set if everybody who,

7     in connection with the marketing of an insurance policy -- who

8     refused to read the policy, then claimed a subjective net

9     impression of surprise that they don't have unconditional full

10    coverage for every single thing, were permitted to bring claims

11    in state and federal court?  You don't see those claims because

12    they're not permitted.  And they are not permitted because the

13    statutory scheme in Florida, which is embraced by Congress,

14    says:  "The regulatory authorities deal with these issues of

15    advertising and practices of sale."

16          You can't sue insurance companies because you don't

17    like what's in their insurance policy because you believe you

18    were misled.  Here there was no misleading statement.  But

19    opening the door to these kinds of claims, which are based upon

20    subjective impressions, would be, I would suggest, opening the

21    flood gates improperly.  Beyond that, allowing this type of

22    claim to go forward on a class basis, where every single

23    person's impressions about whether they could have coverage for

24    their particular trip and their particular reason for

25    cancellation and whatnot, is just not suitable.  And it would

1    put this Court into a morass if we -- and particularly the

2    Defendants, if we had to start litigating those kind of issues

3    and engaging in broad-based discovery.

4          The law doesn't allow Mr. Arencibia to be a private

5    attorney general.  It simply doesn't.  The private attorney

6    general is the actual Attorney General for the State of

7    Florida.  That is the entity, I presume -- and I don't -- maybe

8    it's a different lawyer with the Department of Insurance -- but

9    they have the regulatory authority to address the complaints

10   that Mr. Arencibia has.  But Mr. Arencibia doesn't have

11   standing to complain that he failed to read the policy and then

12   express surprise that he didn't get, quote, no-fault insurance,

13   a concept that is wholly inapplicable to the circumstances of

14   travel insurance here.

15         Your Honor, these claims are -- they are barred

16   because they are factually flawed.  There's just no basis --

17   Judge O'Connor nailed it when he said:  "There's just no basis

18   for a misrepresentation.  You had all this information."

19   Putting aside all of that, the law with regard to unjust

20   enrichment, it's barred under FUITPA, under FDUTPA, the Florida

21   Deceptive and Unfair Trade Practices Act, that's so clearly

22   applicable here.  He's suing an insurance company for insurance

23   practices, both of which are barred under the act.

24         And then, for RICO, for the reasons I've already

25   explained, there is no claim on the merits.  On the facts, it's

1   barred by McCarran-Ferguson Act.  And I'm not, by not

2   mentioning it, abandoning the arguments with regard to

3   causation and the failure to allege a RICO enterprise.  I note

4   the Court is familiar with this area of the law.  But what do

5   we have here?  We have three entities, one of whom has been

6   exonerated by Judge O'Connor, that he claims formed a criminal

7   enterprise.  And this enterprise that he claims was formed was

8   for the purpose of selling insurance, which is a lawful

9   activity.  It cannot create a RICO enterprise.  His allegations

10  are not plausible.

11          I've never made the argument before under Iqbal and

12  Twombly.  But Iqbal and Twombly require the Court to say:

13  "Wait a second.  Does this even make sense?"  If it doesn't

14  make sense, it doesn't withstand the Iqbal and Twombly

15  analysis.  And this doesn't make sense.

16          I have no comment with regard to whether Mr. Arencibia

17  was surprised with what he bought because it's clear he didn't

18  read anything.  And people who don't read their policies are

19  oftentimes surprised to find out what's in them.  But that's

20  not to be blamed or put at the feet of Allianz and Jefferson.

21          For all those reasons, and the reasons that are set

22  forth in the briefs, and in Judge O'Connor's order, which I

23  think are not in any way inconsistent with the arguments that

24  we've made, we ask that this amended complaint be dismissed

25  with prejudice.  Counsel has had multiple opportunities to

```
1    address what are obvious fatal flaws that existed at the time

2    he filed this lawsuit.  Each one of them were apparent.  Yet,

3    he boldly went where nobody has gone before, and he should not

4    be permitted to go.

5         Thank you.

6         THE COURT:  Thank you, Mr. Stack.

7         And thank you, Mr. Ayala.  Of course, thank you,

8    Mr. Fernandez.  I appreciate you taking the time to educate the

9    Court.  I appreciate the briefings and the arguments that were

10   presented.  And I believe that it is appropriate for this Court

11   to issue a written order on the Motion to Dismiss.

12        MR. STACK:  Thank you very much.

13        THE COURT:  All right.  Everyone take good care.  And

14   it was nice to spend time with you.  And I know this case is

15   important to you.  It is as well important to the Court.

16        MR. STACK:  Thank you so much, Your Honor.

17        THE COURT:  Take care.

18        MR. STACK:  Take care.

19     (Proceedings concluded at 10:51 a.m.)

20

21

22

23

24

25
```

```
 1   UNITED STATES OF AMERICA      )

 2   ss:

 3   SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5        I, Yvette Hernandez, Certified Shorthand Reporter in

 6   and for the United States District Court for the Southern

 7   District of Florida, do hereby certify that I was present at

 8   and reported in machine shorthand the proceedings had the 3rd

 9   day of March, 2021, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.  Please note:  This

12   hearing occurred during the COVID-19 pandemic and is therefore

13   subject to the technological limitations of reporting remotely.

14        I further certify that this transcript contains pages

15   1 - 48.

16        IN WITNESS WHEREOF, I have hereunto set my hand at

17   Miami, Florida this 26th day of May, 2021.

18

19                    /s/Yvette Hernandez
                      Yvette Hernandez, CSR, RPR, CLR, CRR
20                    400 North Miami Avenue, 10-2
                      Miami, Florida 33128
21                    (305) 523-5698
                      yvette_hernandez@flsd.uscourts.gov
22

23

24

25
```